## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| **PNA Bank, f/k/a Alliance FSB, a Federally Chartered Savings Bank,** | ) ) ) ) | Court of Cook County, Illinois, County Department, Chancery Division Case No. 2008 CH 25809 |
| **Plaintiff,** | ) ) ) | **Case No. 08 cv 4153** |
| **v.** | ) ) ) | **Honorable Judge Grady** |
| **Open Solutions, Inc., an Illinois corporation, as successor in interest to BISYS, Inc., a Delaware corporation,** | ) ) ) ) ) | **Magistrate Judge Brown** |
| **Defendant.** | ) ) ) | |

## EMERGENCY MOTION TO REMAND TO THE CIRCUIT COURT OF COOK COUNTY PURSUANT TO FRCP 12(b)(1), OR IN THE ALTERNATIVE, EMERGENCY MOTION FOR MANDATORY INJUNCTION

NOW COMES, Plaintiff, **PNA Bank**, f/k/a Alliance FSB, a Federally Chartered Savings Bank ("PNA Bank"), by its attorneys, **Stone Pogrund & Korey, LLC**, and for its Emergency Motion to Remand to the Circuit Court of Cook County Pursuant to FRCP 12(b)(1), or in the Alternative, Emergency Motion for Mandatory Injunction against Defendant, **Open Solutions, Inc.** a Delaware corporation ("OSI"), as successor in interest to BISYS, Inc., a Delaware corporation, states as follows:

### I.    PROCEDURAL HISTORY

On July 17, 2008, Plaintiff PNA Bank filed its Verified Complaint with the Circuit Court of Cook County against OSI alleging two counts: Count I for Specific Performance compelling OSI to convert and deliver certain client data files to PNA Bank, and Count II for Declaratory Judgment requesting that this Court make a declaration as to the amount owed to OSI for the

deconversion services pursuant to an agreement between the parties as fully set forth below. A copy of the Verified Complaint is attached hereto as Exhibit "1".

On July 22, 2008, OSI filed its Notice of Removal with this Court alleging it has a right of removal pursuant to 28 U.S.C. § 1441. Specifically, the Notice of Removal alleges that the Federal Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). PNA Bank does not dispute that the parties are "citizens of different States." However, PNA does dispute that the amount in controversy "exceeds the sum or value of $75,000.00." Specifically, the amount in controversy is exactly $48,741.58 as set forth below. Therefore, this court does not have jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and this case must be immediately remanded to the Circuit Court of Cook County on an expedited basis. The nature of the emergency is also set forth below.

## II.    **FACTS**

That on or about March 18, 1999, BISYS, Inc. and PNA Bank entered into a Services Agreement (the "Agreement") whereby BISYS, Inc. agreed to provide bank data processing software to PNA Bank. A true and accurate copy of the Agreement is attached hereto as Exhibit "2". (OSI took an assignment of the Services Agreement from BISYS, Inc. pursuant to a merger in or around 2007). Pursuant to the Agreement, OSI provides bank data processing software services to PNA Bank, including, but not limited to: customer account support including deposit transactions, ATM and online banking, interest rate processing, and mortgage loan services. The term of the Agreement is set to expire on September 30, 2008. On March 4, 2008, PNA Bank served notice on OSI that it had opted not to renew the Agreement, and has opted to use another provider, Metavante Corporation, for its banking system software. A copy of the March 4, 2008 letter is attached hereto as Exhibit "4". On July 16, 2008, PNA Bank served notice on OSI that it opted to extend the term until the official scheduled conversion date to Metavante, which is

November 17, 2008, pursuant to Paragraph 2(C) of the Agreement. A copy of the July 16, 2008 letter is attached hereto as Exhibit "5".

In order to transition the bank software from OSI to Metavante, PNA Bank requires that OSI "deconvert" the data from OSI's format to a format that could then be transferred to Metavante's operating system. The deconversion process requires OSI to convert the data by saving the data on tapes in "BISYS format," delivering those tapes to PNA Bank, and then provide follow up support to aid in the conversion process.

That on July 17, 2008, PNA Bank made a demand to OSI to begin the deconversion process by delivering a "first cut" of the client data on tapes to PNA Bank. A copy of the July 17, 2008 letter is attached hereto as Exhibit "6". However, OSI has refused to begin the deconversion process as a dispute arose among the parties regarding the amount of the payment for the deconversion services. PNA Bank maintains that the cost of deconversion is $26,258.42 pursuant to an Addendum to Services Agreement dated March 18, 1999 (the "Addendum") entered into by the parties. A true and accurate copy of the Addendum is attached hereto as Exhibit "3". Section 2.4 of the Addendum specifically limits "any increase in the charges for any Services...to the lesser of...the percentage increase in the United States Consumer Price Index as published by the Bureau of Labor Statistics." OSI maintains that the cost of deconversion is an arbitrary figure of $75,000.00 which it claims is its current price for deconversion. The parties do not dispute that the price of deconversion at the time of the execution of the Agreement was $20,000.00. OSI's proposed deconversion fee is an unconscionable Two Hundred and Seventy Five Percent (275%) increase from the cost of deconversion at the time of the execution of the Agreement. OSI has refused to deconvert the data until it is paid its demanded figure of $75,000.00.

An emergency situation has arisen regarding the timing of the deconversion. PNA Bank's new software servicer, Metavante, has informed PNA Bank that it requires the "first cut" of data from OSI **no later than August 1, 2008**. If OSI does not release the deconverted client data on or before August 1, 2008, PNA Bank will miss its window to convert to the Metavante system, and will not be able to make its conversion until March, 2009, per Richard J. Smies, Vice President of Metavante Corporation. See Affidavit of Richard J. Smies attached hereto as Exhibit "8". **Therefore, if OSI does not release the converted date on or before August 1, 2008, PNA Bank will be without necessary banking software for all client accounts from November 17, 2008 until March, 2009. This will cause an unspecified sum of significant damages and irreparable harm to PNA Bank including, but not limited to: business interruption including loss of profits, customers, reputation and goodwill. Essentially, PNA Bank will be incapable of processing bank transactions for the approximate four (4) month period. This will impact PNA Bank's approximately Eight Thousand (8000) accounts, the majority of which are held by senior citizens.** Therefore, it is absolutely imperative and vital to PNA Bank's business that the "first cut" of data be delivered by OSI on or before August 1, 2008. On information and belief, the "first cut" of data can be prepared by OSI in one day or less.

PNA Bank now comes to this Court requesting a mandatory injunction compelling OSI to deliver this "first cut" of client data by August 1, 2008, and further cooperate with the deconversion process. PNA Bank will agree to pay OSI the sum of $26,258.42, instanter, which represents the sum PNA Bank maintains it owes OSI for the deconversion. PNA Bank will further agree deposit the sum of $48,741.58 (representing the disputed sum between $75,000.00 and $26,258.42) in an interest bearing escrow account until the contractual dispute regarding the amount of the payment of deconversion can be resolved by this Court.

**III.    ARGUMENT**

**A.    THIS CASE MUST BE REMANDED TO STATE COURT AS THIS COURT DOES NOT HAVE ORIGINAL JURISDICTION PURSUANT TO 28 U.S.C. § 1332(a) AS THE AMOUNT IN CONTROVERSEY DOES NOT EXCEED $75,000.00.**

As stated above, the Verified Complaint filed in the Circuit Court of Cook County alleges two counts: Count I for Specific Performance requesting that the court compel OSI to deliver the converted data, and Count II for Declaratory Judgment requesting that the court declare that the amount of the deconversion is $26,258.42 pursuant to the Agreement. See Exhibit "1". Therefore the Verified Complaint seeks only equitable relief and not a monetary sum.

Our 7th Circuit has ruled that in a suit for injunctive relief, "the amount in controversy is measured by the value of the object of the litigation." Macken v. Jensen, 333 F.3d 797, 799 (7th Cir. 2003). "In this circuit, the object may be valued from either perspective - what the plaintiff stands to gain, or what it would cost the defendant to meet the plaintiff's demand." Id. at 800. As stated above, PNA Bank stands to gain nothing in this litigation, other than the critical data it requires to maintain its continuing business; in actuality, PNA Bank only stands to lose if the relief it requests is not granted.

Therefore, the issue becomes, what would it cost the Defendant to meet the Plaintiff's demand? As alleged, PNA Bank maintains that the amount for deconversion is $26,258.42 per the Agreement. It is clear and undisputed that OSI maintains that the standard deconversion package rate is $75,000.00. This fact was confirmed in a letter from Paul Stuart of OSI to Lawrence Chlum of PNA Bank dated July 22, 2008. A copy of the July 22, 2008 letter along with OSI's Standard Services Deconversion Price List are attached hereto as Exhibit "9". The amount of the "Standard Services Deconversion Package" is the only amount at issue per the Verified Complaint. Any other charges disputed between the parties are irrelevant and

speculative at this point. Therefore the amount in dispute or "controversy" would be $48,741.58, or the difference between $26,258.42 and $75,000.00.

It is unknown what it actually costs OSI to deconvert the data, ie. its cost of labor to complete the conversion. Neither PNA Bank's nor OSI's proposed figures represent what it _actually costs_ OSI to deconvert the data – it is only represents the service fee they are entitled to charge its customers. However simple logic dictates that the cost of the labor would be far below the $75,000.00 figure OSI maintains it is owed. Further, *assuming arguendo* that this Court accepts OSI's deconversion fee of $75,000.00 as the "amount in controversy," a plain reading of 28 U.S.C. § 1332(a) clearly states that the matter in controversy must **exceed** the sum of $75,000.00. Finally, it is OSI, as the proponent of federal jurisdiction, who has the burden to establish diversity jurisdiction. Rubel v. Pfizer, Inc., 361 F.3d 1016, 1019 (7th Cir. 2004). OSI has not and cannot meet this burden. Therefore, this case must be remanded to the Circuit Court of Cook County.

**B.  IN THAT ALTERNATIVE, IN THE CASE THAT THIS COURT FINDS IT HAD JURISICTION OVER THIS MATTER, PNA BANK REQUESTS AN EMERGENCY MANDATORY INJUNCTION TO RECOVER ITS DECONVERTED CLIENT FILES BY AUGUST 1, 2008.**

In the alternative, in the case that this Court maintains it has jurisdiction over this matter, PNA Bank now requests that this Court enter a mandatory injunction compelling OSI to deliver the "first cut" of converted data to PNA Bank on or before August 1, 2008 and further cooperate with PNA Bank until the conversion is complete. As stated above, PNA Bank will immediately pay OSI the sum of $26,258.42 and place the disputed amount of $48,741.58 into an interest bearing escrow account, with attorneys for PNA Bank as escrowee. The order shall provide that escrowee may not disburse any sums from the escrow account without court order.

I.    **PLAINTIFF HAS ESTABLISHED THE ELEMENTS NECESSARY TO
      OBTAIN MANDATORY INJUNCTIVE RELIEF**

To obtain mandatory injunctive relief, Plaintiff must establish (1) a clearly ascertainable

right which needs protection; (2) that the party would suffer irreparable injury without the

protection of the injunction; (3) the absence of an adequate remedy at law; and (4) a likelihood of

success on the merits. Alber v. Illinois Dept. of Mental Health and Developmental Disabilities,

786 F. Supp. 1340, 1356 (N.D. Ill. 1992). **Mandatory Relief is necessary in this case to
maintain the status quo, as PNA Bank requires access to its client files in a standard format
by August 1, 2008 to avoid potential business interruption, loss of customers, profits,
reputation and goodwill.**

As stated above, if PNA Bank does not have possession of its client files in a standard

format by August 1, 2008, it risks an interruption of banking services from approximately

November 17, 2008 until March, 2009. Without uninterrupted continuation of its banking

services software, PNA Bank will be effectively shut down and unable to process its customers'

transactions for approximately four (4) months. Therefore, PNA Bank requires mandatory action

of this Court to ensure that PNA Bank does not suffer a business interruption with significant

damages to its profits, customer base, and reputation.

Illinois courts have consistently defined the status quo as "the last peaceful, non-

contested status which preceded the pending controversy." Continental Cablevision of Cook

County, Inc., 238 Ill.App.3d 774, 790 (1st Dist. 1992). Although the general practice is to

preserve the status quo by keeping all actions at rest, "it sometimes happens that the status quo is

a condition not of rest, but of action, and the condition of rest is exactly what will inflict the

irreparable injury on the complainant." Id. (*See also* Gold v. Ziff Communications where the

court required a publisher of a computer magazine to continue to accept reduced rate

advertisements from mail-order company until the contractual dispute could be resolved. Gold v. Ziff Communications Company, 196 Ill.App.3d 425 (1st Dist. 1989)).

A case with very similar facts was decided in the Northern District of Illinois, and affirmed by our 7th Circuit with regard to a mandatory injunction to release computerized records to avoid future business injury to the plaintiff. LTD Commodities, Inc. v. Perederij, 699 F.2d 404 (7th Cir. 1983). In LTD Commodities, a mail-order house sued a computer service provider for the return of computerized records which had been given to the computer service provider to perform services for the mail-order house. Id. The computer service provider refused to release records after a dispute arose regarding payment for the services. Id. at 407. The Court entered a mandatory injunction compelling the records to be returned to the mail-order house, and ordered that the mail-order house place the disputed amount in escrow until the contractual issue could be resolved. Id. at 408. In the lower court, Judge Shadur recognized that LTD would suffer irreparable injury without access to its computer software. Id.

Judge Dumbauld, speaking for the 7th Circuit on appeal in affirmation of the lower court's decision, stated the following regarding mandatory injunctive relief:

> …In many cases vital interests of litigants may be jeopardized by procrastination, and immediate action may be necessary to prevent irreparable injury threatened by intervening circumstances. The court's final judgment may prove nugatory and futile if measures of relief *pendente lite* are not taken in the meantime…Because of the nature and function of relief *pendente lite* as a regulation of the interim status quo so as to assure that the prevailing party when final judgment on the merits has been rendered will not find his victory valueless…The status itself may be one of continuing action…and it is the last uncontested status preceding the controversy which is to be maintained by the court, rather than a status wrongfully altered by unilateral action after the dispute has arisen. Id. at 405-406.

Therefore, there are times when mandatory injunctive relief is necessary to maintain the status quo, as in the case at bar, when there is a potential business interruption with potentially significant damages.

### i.    PNA Bank has a clearly ascertainable right to its client data pursuant to the terms of the Agreement.

Section 9(B) of the Agreement provides:

> B. At Client's request…[OSI] shall deliver to [PNA Bank] all of the Client Files then retained by [OSI] including file layouts and their descriptions in BISYS format and shall provide in accordance with BISYS deconversion policies. reasonable and necessary assistance with the deconversion from the BISYS System to a non-BISYS system ("Deconversion").

That on July 17, 2008, PNA Bank made its request for Deconversion pursuant to the Agreement.

See Exhibit "6". However, OSI has rejected the request until it is paid its demanded sum of $75,000.00.

Illinois courts have held that the specific performance of an existing contract is a clearly ascertainable right in need of protection for the purpose of ordering a mandatory injunction. Gold. 196 Ill.App.3d 425, 432. Therefore the existing contractual obligation of OSI to deconvert the data is a right in need of protection for the purposes of a mandatory injunction.

### ii.    PNA Bank will suffer irreparable injury if the mandatory injunction is not entered compelling OSI to deconvert the data by August 1, 2008.

As stated above. if the mandatory injunction is not entered, PNA Bank will suffer irreparable injury in the form of lost profits. customers. reputation. and goodwill as it will be essentially shutdown from November 17, 2008 until March, 2009. Illinois courts have held that "the loss of customers and sales and the threat of continuation of such losses to a legitimate business interest…is sufficient to show that plaintiff will suffer irreparable injury unless protected. Gold. 196 Ill.App.3d 425, 434; Petrzilka v. Gorscak, 199 Ill.App.3d 120, 124 (2[nd] Dist. 1990). Therefore the above described injury to PNA Bank is sufficient to show an irreparable injury to state a claim for mandatory injunction.

### iii.    PNA Bank does not have an adequate remedy at law as potential damages are unforeseen and incalculable.

If PNA Bank misses its window for deconversion to its new service provider. it will

suffer significant injury as described above. It would be impossible to calculate a monetary figure that could make PNA Bank whole if such business interruption occurred. "While immediate damages...may be calculable, the potential loss of future business is incapable of adequate computation...a preliminary injunction may be granted when it is difficult to quantify the damages causes by the loss of future customers and revenues." Gold, 196 Ill.App.3d 425, 434 (finding no adequate remedy at law when losses from business interruption are difficult to calculate). "The loss of a competitive position is an intangible but real damage not readily measureable, and, therefore, the harm suffered by plaintiffs cannot be adequately remedied in law." Petrzilka, 199 Ill.App.3d 120, 124 (no adequate remedy at law when there is a potential loss of future sales). Due to incalculable losses from business interruption, PNA Bank has no adequate remedy at law.

### iv. PNA Bank has a likelihood of success on the merits on both counts for Specific Performance and Declaratory Judgment.

As stated above in Paragraph A(ii), PNA Bank has a clear contractual right have its client files returned in a deconverted standard format. OSI has the clear contractual obligation to return the data to PNA Bank in the form specified. PNA Bank has completed all of its obligations under the Agreement, and as stated above, has no adequate remedy at law.

Further, PNA Bank is likely to succeed on its claim for Declaratory Judgment requesting that this Court make a declaration that PNA Bank owes OSI the sum of $26,258.42 as alleged in the Verified Complaint, and not $75,000.00 as alleged by OSI. Specifically, the parties agree that the price for deconversion at the time of execution of the Agreement, pursuant to the BISYS Price List, was:

> One-hundred percent (100%) of Average of last twelve (12) months charges Exclusive of Discounts for services provided under Standard Services Price List. (MINIMUM of Twenty Thousand Dollars [$20,000.00]). See relevant page of BISYS Price List for Conversion/Deconversion Services attached hereto as Exhibit "7".

Since PNA Bank is a small bank compared to OSI's other customers, the average charges over the last twelve months of service was less than the minimum. Therefore, it is undisputed that the charges for deconversion at the time of Contract execution was $20,000.00.

The Agreement does state in Paragraph 9(B), that "Client shall pay BISYS for Deconversion assistance in accordance with BISYS' then current Deconversion rate schedule." OSI maintains that its current Deconversion rate is $75,000.00. However, at the time of the execution of the Contract, the attorneys for PNA Bank specifically negotiated the Addendum in order to restrain BISYS (or its successor) from charging an arbitrary fee for deconversion. See Exhibit "3". The Addendum, in Paragraph 2.4, specifically limits the increase in price for any services provided by OSI to PNA Bank. It states in pertinent part:

> **BISYS agrees that any increase in the charges for any Services will be limited in the aggregate to the lesser of (i) five percent (5%) per year, or (ii) the percentage increase in the United States Consumer Price Index as published by the Bureau of Labor Statistics, United States Department of Labor ("CPI") during the twelve month period immediately preceding the date of such increase.** See Exhibit "3".

"Services" is defined in Paragraph 1 of the Agreement as "services selected by [PNA Bank]". Therefore the correct amount PNA Bank owes OSI is $26,258.42 using the CPI method as it is the "lesser" of the two methods. (See the Verified Complaint PP 15 for the precise calculation). Therefore, PNA Bank will be successful on its Declaratory Judgment action as alleged in the Verified Complaint.

## 2. THE BALANCING OF THE HARDSHIPS WEIGHS IN FAVOR OF PNA BANK AS OSI IS PROTECTED IN THE CASE IT IS VICTORIOUS AT TRIAL

Per the prayer for relief below, PNA Bank has suggested an order whereby it will pay OSI the sum of $26,258.42 instanter, and place the remaining disputed sum of $48,741.58 will be held in escrow until the resolution of the contractual dispute between the parties. Therefore, if

OSI is successful at trial, it will be protected as to the $75,000.00 it claims it is owed. Therefore, there is no risk to OSI if this Court grants the requested mandatory injunction.

However, if PNA Bank does not receive the deconverted data by August 1, 2008, it risks significant losses from business interruption in profits, customers, reputation and goodwill as described herein. Therefore it is absolutely imperative to the continued business of PNA Bank that the relief it requests is granted.

**WHEREFORE**, PNA Bank, f/k/a Alliance FSB, prays that the Court grant the following relief:

A.    That this Court order a mandatory injunction compelling Open Solutions, Inc. to deliver a deconverted "first cut" of PNA Bank's client data to PNA Bank on or before August 1, 2008, and continue to cooperate and timely provide deconversion assistance to PNA Bank;

B.    That this Court order PNA Bank to pay Open Solutions, Inc. the sum of $26,258.42 instanter;

C.    That this Court order PNA Bank to place the sum of $48,741.58 in an interest bearing escrow account, with PNA Bank's counsel as escrowee, not to be released without court order pending resolution of this matter;

D.    Grant any further relief as this Court deems proper.

> Respectfully submitted,
> PNA Bank f/k/a Alliance FSB
>
> By: _____
>        One of its attorneys

Christopher T. Nowotarski
Dean J. Lurie
**STONE POGRUND & KOREY LLC**
1 East Wacker Dr., Ste. 2610
Chicago, IL 60601
T: 312-782-3636
Atty. No. 90803

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that I have read the foregoing Emergency Motion for Mandatory Injunction, and the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.


PNA Bank, f/k/a Alliance FSB

By: _____
    Lawrence Chlum, President


Christopher T. Nowotarski
Dean J. Lurie
**STONE POGRUND & KOREY LLC**
1 East Wacker Dr., Ste. 2610
Chicago, IL 60601
T: 312-782-3636
Atty. No. 90803

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

| | |
|---|---|
| **PNA Bank, f/k/a Alliance FSB, a Federally Chartered Savings Bank,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) ) |
| **Open Solutions, Inc., a Delaware corporation, as successor in interest to BISYS, Inc., a Delaware corporation,** | ) ) ) ) ) ) |
| **Defendant.** | ) ) |

Case No.

# 08CH25809

EXHIBIT
1

## VERIFIED COMPLAINT

**NOW COMES,** Plaintiff, **PNA Bank, f/k/a Alliance FSB,** a Federally Chartered

Savings Bank, by its attorneys, Stone Pogrund & Korey, LLC, and for its Complaint against

Defendant, **Open Solutions, Inc.** a Delaware corporation, as successor in interest to BISYS, Inc.,

a Delaware corporation, states as follows:

## GENERAL ALLEGATIONS

**The Parties and Jurisdiction**

1.    Plaintiff, PNA Bank f/k/a Alliance FSB ("PNA Bank") is a Federally Chartered

Savings Bank. Prior to on or about November 2007, PNA Bank was known as Alliance FSB.

2.    Defendant Open Solutions, Inc. is a Delaware corporation ("Open Solutions"). On

information and belief, on or about March 2006, Open Solutions acquired BISYS, Inc., a

Delaware corporation ("BISYS").

3.    Jurisdiction is proper in the Circuit Court of Cook County pursuant to written

agreement of the parties. See Ex. B at ¶ 5.2.

## The Agreements

4.     On or about March 18, 1999, PNA Bank, then known as Alliance FSB, entered into a Services Agreement ("Services Agreement") with BISYS whereby BISYS was to provide data processing software and services to PNA Bank. A copy of the Services Agreement is attached hereto and made a part hereof as Exhibit A. Pursuant to Paragraph 1 of the Services Agreement, a current price list of services to be provided by BISYS to PNA Bank was attached to and made a part of the Services Agreement ("Current Price List"). A copy of the Current Price List is attached hereto and made a part hereof as Ex. B. On or about the same date, PNA Bank and BISYS executed an Addendum to Services Agreement (hereinafter "Addendum"). A copy of the Addendum is attached hereto and made a part hereof as Ex. C.

5.     On or about December 11, 2001, PNA Bank, then known as Alliance FSB, and BISYS executed an Amendment to the Services Agreement (hereinafter "First Amendment") extending the term of the Services Agreement and Addendum for sixty (60) months, or until on or about September 30, 2007. A copy of the First Amendment is attached hereto and made a part hereof as Exhibit D.

6.     On or about April 12, 2007, Open Solutions, Inc., as successor-in-interest to BISYS, Inc., and Alliance FSB executed a second amendment to the Services Agreement (hereinafter "Second Amendment"), which extended the term of the Services Agreement and Addendum for twelve months, or until September 30, 2008. A copy of the Second Amendment is attached hereto and made a party hereof as Exhibit E. Hereinafter, the Services Agreement, Addendum, First Amendment and Second Amendment are collectively referred to as the "Agreements."

7.     Pursuant to the Agreements, Open Solutions was to provide certain electronic data processing software ("Open Solutions Software") and services ("Open Solutions Services") to

PNA Bank. The Open Solutions Software and Open Solutions Services facilitate the storage of information concerning all PNA Bank customer banking transactions in a database ("PNA Bank Database"). The PNA Bank Database stored in an electronic format that can only be read by the Open Solutions Software ("Open Solutions Format").

8.    The Open Solutions Software is proprietary and is owned by Open Solutions. Pursuant to the Agreements, PNA Bank is granted a limited license to use the Open Solutions Software for the duration of the term of the Agreements. (See Ex. 10.A, Services Agreement at ¶ 10.B). Pursuant to the Agreements, upon termination of the Agreements, PNA Bank has no right to use the Open Solutions Software. Accordingly, upon termination of the Agreements, PNA Bank will not be able to read the PNA Bank Database because it is in the Open Solutions Format.

9.    Pursuant to the Agreements, upon termination of the Agreements, Open Solutions is required to provide reasonable and necessary assistance to PNA Bank to convert the PNA Bank Database from Open Solutions Format to a format other than Open Solutions Format ("Deconversion Services"). See Agreement, Ex. A, at ¶ 9.B.

10.    The Current Price List, attached hereto as Ex. B, sets out the cost of the Deconversion Services (See Ex. B at p. B-12):

> One-hundred percent (100%) of Average of last twelve (12) months charges exclusive of Discounts for services provided under the Standard Services Price List. (MINIMUM of Twenty Thousand Dollard [$20,000.00]).

11.    Pursuant to Paragraph 2.4 of the Addendum increases in "charges for any Services will be limited in the aggregate to the lesser of (i) five percent (5%) per year, or (ii) the percentage increase in the United States Consumer Price Index as published by the Bureau of Labor Statistics, United States Department of Labor... ("CPI") during the twelve month period immediately preceding the date of each such increase."

12.    Pursuant to paragraph 5.1 of the Addendum, in case of a dispute between the parties, the substantially prevailing party shall be entitled to recover its litigation costs and reasonable attorneys' fee. See Ex. C at ¶ 5.1.

**Termination and Wrongful Conduct by Open Solutions**

13.    On or about March 4, 2008, PNA Bank advised Open Solutions that it would not renew the Agreements upon the completion of the current term, which terminates on September 30, 2008. See President of PNA Bank, Lawrence Chlum's, March 4, 2008 letter attached hereto and made a part hereof as Ex. F.

14.    Pursuant to Paragraph 9 of the Services Agreement, PNA Bank requested Deconversion of the PNA Bank Database to a format other than Open Solutions Format.

15.    Pursuant to the Agreements, the fee for the Deconversion is calculated as follows:

| Contract Reference | Amount |
|---|---|
| Cost of Service at time Agreements were entered into, see Price List, Page B-12 (Ex. B) | $20,000.00 |
| Increase limited to 31.29% increase in CPI: (Ex. C at 2.4) | $6,258.42 |
| **TOTAL COST OF DECONVERSION LIMITED TO:** | **$26,258.42** |

16.    Open Solutions advised PNA Bank that it will not begin the Deconversion until and unless PNA Bank pays the sum of not less than $75,000.00 to Open Solutions, which is a sum much greater than the amount agreed to by the parties pursuant to the Agreements.

17.    PNA Bank has retained a new vendor to provide electronic data processing software and services to PNA Bank ("New Data Processing Vendor") as of November 17, 2008.

18.    On or about July 16, 2008, PNA Bank, by its attorneys Stone Pogrund & Korey LLC, notified Open Solutions that, pursuant to paragraph 2(c) of the Agreements, it was extending the termination date to November 17, 2008. A copy of Patrick Joy's July 16, 2008 letter to Open Solutions, Inc. is attached hereto and made a part hereof as Exhibit G.

19.    The New Data Processing Vendor has advised PNA Bank that, in order to commence its services on November 17, 2008, it must receive a copy of the deconverted PNA Bank Database not later than July 30, 2008. The New Data Processing Vendor has further advised that if it does not receive the PNA Bank Database by July 30, 2008, that it will not be able to provide data processing software and services to PNA Bank until approximately March, 2009.

## COUNT I
## SPECIFIC PERFORMANCE

1-19.    PNA Bank restates and realleges Counts 1-17 of the General Allegations as Counts 1 - 17 of Count I as if fully set forth herein.

20.    On or about May 15, 2008, Open Solutions advised PNA Bank that it would not perform under the terms of the Agreements when it refused to provide Deconversion for the price agreed to in the Agreements.

21.    PNA Bank has performed the conditions of the Agreements that it was supposed to perform, except those that Open Solution's actions prevented it from performing.

22.    At all relevant times, PNA Bank has been ready, willing and able to complete its performance of the Agreements.

23.    PNA Bank has demanded that Open Solutions comply with the terms of the Agreements to no avail.

24.     Plaintiff PNA Bank has no adequate remedy at law for Open Solution's breach of the agreement. If Open Solutions refuses to complete the Deconversion then PNA Bank will be completely unable to conduct business after November 17, 2008, because it will not be able to access any data in the PNA Bank Database. PNA Bank will not be able to access any of its customer data until about March 2009 and, as a result, will suffer irreparable harm due to lost customers and lost revenue. Further, PNA Bank will also face liability for numerous violations of state and federal banking laws. Monetary damages are inadequate.

**WHEREFORE,** PNA Bank, f/k/a Alliance FSB, prays that the Court grant the following relief:

A.     Enter judgment for PNA Bank f/k/a Alliance FSB and against Open Solutions, Inc, directing Open Solutions, Inc. to specifically perform the Agreement and complete the Deconversion services pursuant to the Agreements;

B. Grant plaintiff's Attorneys' fees;

C. Grant plaintiff's costs of this action; and

D. Grant any further relief as it deems proper.

## COUNT II
## DECLARATORY JUDGMENT

1 - 19. PNA Bank restates and realleges Counts 1-17 of the General Allegations as Counts 1 - 19 of Count II as if fully set forth herein.

20.     Pursuant to the Agreement, the cost for Deconversion is governed by the Price List attached as Exhibit B and by Paragraph 2.4 of the Addendum attached as Exhibit C.

21.     Defendant Open Solution, Inc. falsely claims that it is entitled to be paid $75,000.00 for the Deconversion.

22.     An actual controversy exists between plaintiff and defendants and by the terms and provisions of Section 2-701 of the Code of Civil Procedure, this court is vested with the

power to declare the rights and liabilities of the parties and to give any further relief as may be necessary. 735 ILCS 5/2-701.

23.    Judicial Declaration is necessary and appropriate at this time because there is an actual controversy between the parties about the pricing of Deconversion and a declaratory judgment would terminate the controversy or some part of it.

**WHEREFORE**, PNA Bank, f/k/a Alliance FSB, prays that the Court grant the following relief:

A. This court determine and adjudicate the rights and liabilities of the parties with respect to the Agreements described above.

B. This Court find that under the Agreements the fee for Deconversion is $26,258.42.

C. Grant plaintiff's Attorneys' fees

D. Grant plaintiff's costs of this action; and

E. Grant any further relief as it deems proper.

Respectfully submitted,
PNA Bank f/k/a Alliance FSB

By: _____
One of its attorneys

Christopher T. Nowotarski
Dean J. Lurie
Patrick T. Joy
**STONE POGRUND & KOREY LLC**
1 E. Wacker Dr., Ste. 2610
Chicago, IL 60601
T: 312-782-3636
F: 312-782-1482
Atty. No. 90803

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Date: ___7/16/08___

PNA Bank, f/k/a Alliance FSB

By: _Lawrence H Chlum_
 Lawrence Chlum, President

Stone Pogrund & Korey
Attorney for Plaintiff
1 E. Wacker Dr., Ste. 2610
Chicago, Illinois 60601
312/782-3636
#90803

**SERVICES AGREEMENT**

BISYS, INC.
11 Greenway Plaza
Houston, Texas 77046-1102

Contract No. **CHC - 2779**
Price List No. 07-96

Client   Alliance FSB

Address   7840 North Milwaukee Avenue

City   Niles          State          Illinois          Zip Code   60714

## 1. SCOPE OF AGREEMENT

Client agrees to convert to the BISYS system (defined in Paragraph 2(C) below) and BISYS, Inc. ("BISYS") shall provide Client, in accordance with this Agreement, the services selected by Client from BISYS' then applicable Standard Services Price List and/or Special Services Price List (collectively, the "Price Lists") (collectively, the "Services"). BISYS shall provide the reports listed on the Standard Reports List and Special Reports List as applicable to the Services selected by Client. The current Price Lists are attached hereto and made a part hereof.

## 2. TERM OF AGREEMENT

A. The initial term of this Agreement shall commence the date this Agreement is executed by both parties and end 60 full calendar months after the "Conversion Date" (as defined in Paragraph 4 (B)) (the "Initial Period").

B. The Agreement shall automatically continue after the Initial Period for subsequent consecutive terms of three years each unless and until it is terminated by either party upon written notice to the other given at least 180 days prior to the end of the Initial Period or any additional three year period.

C. If Client has given BISYS notice pursuant to Paragraph 2(B) and Client intends to deconvert from the BISYS data processing system ("BISYS System"), Client may, upon written notice to BISYS given at any time during the final 120 days of this Agreement (as determined in accordance with 2(B) above) or any extension hereof pursuant to this Paragraph 2(C), extend the termination date to the date indicated in such notice, which date shall not be, in any event, less than 120 days after the date of such notice. Commencing at the end of the Initial Period or any renewal period (as applicable), Client shall pay for Services at the prices set forth in the then current BISYS Price Lists notwithstanding the giving of extension notice.

D. Continuing obligations under this Agreement are those relating to "BISYS Products" (defined in Paragraph 10(A)); "Confidential Information" (defined in Paragraph 10(F)) and "Client Files" (defined in Paragraph 8(A)), and such continuing obligations shall survive any termination of this Agreement.

## 3. CHARGES

A. Each month commencing Conversion Date, whether or not Client actually uses any Services during such month, Client shall pay a minimum monthly charge equal to the greater of (i) $2,500.00; (ii) BISYS' charges for the Services actually used by Client during such month; (iii) 80% of the charges invoiced to Client during the immediately preceding month; or (iv) 80% of the charges invoiced to Client for the month immediately preceding any deconversion by Client if Client deconverts from the BISYS System.

B. The initial charges for the Services are specified in the Price Lists, and shall be recorded by the BISYS System or by any other means used by BISYS of determining Client's usage. The charges for the Services listed on the Standard Services Price List as of the date hereof will not be changed by BISYS until the expiration of the first year following Conversion Date. Thereafter, during the remaining term of the Initial Period, the charges for the Services listed on the Standard Services Price List may be changed by BISYS at any time and from time to time upon at least 90 days prior written notice to Client. During the Initial Period, the charges for the Services listed on the Special Services Price List as of the date hereof may be changed by BISYS at any time after the date hereof upon at least 90 days prior written notice to Client. After the Initial Period, the charges for the Services listed on the Price Lists shall automatically, and without notice, be changed to BISYS' standard (non-discounted) list prices then in effect for the respective Services; such prices may, thereafter, be changed by BISYS, at any time and from time to time, upon at least 90 days prior written notice to Client.

C. There shall be added to all charges for the Services furnished Client hereunder amounts equal to any applicable taxes levied or based on such Services, exclusive of taxes based on BISYS' income.

D. No later than the 5th day of each calendar month, BISYS shall invoice (the "Monthly Invoice") Client: (i) for all Services projected to be used by Client during that billing month (the "Billing Month") which charge will be based upon either actual usage and number of accounts during the month prior to the Billing Month or the minimum charge pursuant to Paragraph 3(A); (ii) an amount equal to 100% of the recurring pass through charges actually utilized by Client during the prior month as the estimated pass through charges for the Billing Month; (iii) adjustments (debits/credits) to the prior month's estimated charges set forth in (i) and (ii) above and; (iv) all other charges incurred by Client during the prior month. For the projected portion of the invoice, the first Monthly Invoice shall be based upon BISYS' estimates of usage and shall also include for the prior month (during which the Conversion Date occurred) a full month's charges unless the Conversion Date is after the 15th of the prior month, in which event Client shall be assessed one-half month's charges for the prior month. Client agrees to pay all amounts set forth in the Monthly Invoice by automatic debit by BISYS on the last business day of the Billing Month from a Client bank account established for this purpose (the "Payment Account"). Client agrees to execute any and all required documentation to enable BISYS to perform such automatic debiting of the Payment Account. If Client fails to pay any amounts due under this Agreement, Client shall, upon demand, pay interest at the rate of 1-1/2% per month, but in no event more than the highest interest rate allowable, on such delinquent amounts from their due date until the date of payment. Client agrees to reimburse BISYS for any and all expenses BISYS may incur, including reasonable attorney fees, in taking action to collect any amounts due BISYS hereunder. All amounts due must be paid prior to Client's deconversion from the BISYS System.

## 4. CONVERSION TO THE SERVICES

A. BISYS shall, to the extent applicable, convert machine readable Client Files to make them compatible with the Services selected by Client from the Standard Services Price List. Client agrees to cooperate with BISYS and provide all necessary information and assistance required for BISYS to successfully convert such Client Files. Client will assign a liaison person to assist and cooperate with BISYS in such conversion.

B. BISYS shall determine in accordance with its normal acceptance procedures when the applicable Client Files have been successfully converted and when the Services selected by Client from the Standard Services Price List are operational and available for Client's use. The date the first of the Services selected by Client from the Standard Services Price List is operational and available for Client's use is the "Conversion Date".


EXHIBIT
"A"

### 5. AVAILABILITY OF THE SERVICES

A. Hours for accessing Services on an on-line basis ("On-Line Hours") at the BISYS data center providing Services to Client ("Data Center") are 7:00 A.M. to 9:00 P.M. Monday through Friday and 7:00 A.M. to 6:00 P.M. Saturday (Data Center time) exclusive of BISYS holidays (New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day). A particular Service may also be available at other than On-Line Hours; in which event Client may, at its option and subject to any additional charges therefor, use that Service at such other times.

B. BISYS will make every reasonable effort to have the Services available during the On-Line Hours. However, BISYS cannot and does not guarantee such availability. Accordingly, Client's remedy and BISYS' sole liability to Client or any third party for claims, notwithstanding the form of such claims (e.g., contract, negligence or otherwise), arising out of (i) the unavailability of the BISYS System or (ii) the interruption in or delay of the Services provided or to be provided by BISYS hereunder, shall be for BISYS to use all reasonable efforts to make the BISYS System available and/or to resume the Services as promptly as reasonably practicable.

C. Client shall, at it's expense, be responsible for delivering and transmitting to and from Client's offices, the offices of the applicable regulatory authorities and any other location authorized by Client, and the Data Center all data and information necessary for BISYS to furnish Services to Client.

### 6. USE OF THE SERVICES

A. Client is exclusively responsible for the consequences of its own actions; for any instructions it gives BISYS; for its failure to access the Services in the manner prescribed by BISYS, and for its failure to supply accurate input information. Client is responsible for auditing, balancing, verifying the correctness of calculation routines (such as interest and service charges) and reconciling any out-of-balance condition, and for notifying BISYS of any errors in the foregoing within three business days after receipt of the incorrect information. Client's remedy and BISYS' sole liability to Client or any third party for any claims, notwithstanding the form of such claims (e.g., contract, negligence or otherwise), arising out of errors or omissions in the Services provided or to be provided by BISYS hereunder and caused by BISYS shall be for BISYS to furnish the correct report and/or to correct the applicable Client Files, provided that Client promptly advises BISYS thereof.

B. Client shall use the Services in accordance with such reasonable instructions as may be established by BISYS from time to time as set forth in any written materials furnished by BISYS to Client.

C. Except as otherwise permitted by BISYS, Client will use the Services only for its own internal and proper business purposes and will not sell or otherwise provide, directly or indirectly, any of the Services or any portion thereof to any third party.

D. Client shall not make any alteration, change or modification to any of the computer programs, data bases and/or BISYS supported files used by BISYS in connection with providing the Services to Client hereunder, without BISYS' prior written consent in each instance.

E. BISYS shall give Client 30 days written notice of any BISYS system change which materially affects Client. Nothing herein shall preclude or limit BISYS' ability to make changes to its data processing system.

### 7. COMMUNICATION LINES AND EQUIPMENT.

A. BISYS shall order, on Client's behalf and with Client's approval, the installation of appropriate telephone lines and communications equipment to enable Client to access the Services. Client shall pay all charges relating to the installation and use of such telephone lines and communications equipment.

B. BISYS shall not be responsible for the reliability, or continued availability, of telephone lines and communications equipment used by Client in accessing the Services.

### 8. FILE SECURITY AND RETENTION.

A. Any Client data bases and files or other information provided by Client to BISYS for use with the Services (the "Client Files") shall remain the confidential property of Client. BISYS will provide reasonable security provisions to insure that third parties do not have access to the Client Files. BISYS reserves the right to issue and change regulations and procedures from time to time to improve file security. BISYS will instruct its employees having access to the Client files to keep the same confidential by using the same care and discretion that BISYS uses with respect to its own confidential property.

B. BISYS will take reasonable precautions to prevent the loss of, or alteration to, Client Files, but BISYS cannot guarantee against any such loss or alteration. Accordingly, Client will, to the extent deemed necessary by Client, keep copies of all source documents of information delivered to BISYS and will maintain a procedure external to the BISYS System for the reconstruction of lost or altered Client Files. In connection with the foregoing, it is understood that Client shall assume and be responsible for risk of loss and/or damage to documents and records while they are in transit to and from the Data Center.

C. During the term of this Agreement, BISYS will retain the Client Files in accordance with, and to the extent provided by BISYS' then prevailing records retention policies for the Services, which policies will be consistent with guidelines covering the Services established by appropriate regulatory authorities. BISYS will, upon the expiration of any retention period for Client Files, dispose of Client Files in any manner deemed appropriate by BISYS unless Client, prior to such disposal, furnishes to BISYS written instructions for the disposition of such Client Files at Client's expense. Client shall pay for the provision of Client Files to Client at BISYS' standard rates for such services and BISYS shall provide such Client Files provided that BISYS has been paid for all Services provided hereunder through the date such requested Client Files are returned to Client.

D. BISYS has a written Disaster Recovery Plan establishing emergency procedures, including off-premises backup facility. In connection therewith, BISYS has prepared a Disaster Recovery Manual. The Disaster Recovery Plan and Disaster Recovery Manual are available at the Data Center for examination by bank auditors and examiners and, as they may be modified from time to time, will remain in existence during the term of this Agreement. BISYS shall provide Client, upon written request, with information necessary for Client to develop a disaster contingency plan which will work in concert with BISYS' Disaster Recovery Plan.

### 9. DUTIES UPON TERMINATION; RETURN OF RECORDS.

A. Upon the termination of this Agreement for any reason, BISYS will dispose of all Client Files still in the BISYS System in any manner deemed appropriate by BISYS unless Client, not later than 30 days after such termination, furnishes to BISYS written instructions for the disposition of such Client Files at Client's expense as set forth in Paragraph 9(B).

B. At Client's request as set forth in Paragraph 9(A), BISYS shall deliver to Client all of the Client Files then retained by BISYS including file layouts and their descriptions in BISYS format and shall provide in accordance with BISYS deconversion policies, reasonable and necessary assistance with the deconversion from the BISYS System to a non-BISYS system ("Deconversion"). Client shall pay BISYS for Deconversion assistance in accordance with BISYS' then current Deconversion rate schedule. Payment for Deconversion together with all other payments which are due, and which will become due pursuant to the provisions of this Agreement shall be paid to BISYS prior to delivery of such Client Files.

C. Client Files returned to Client shall be in a standard BISYS machine readable format.

### 10. OWNERSHIP, USE AND CONFIDENTIALITY; BISYS PRODUCTS AND CONFIDENTIAL INFORMATION.

A. All computer programs and related documentation made available, directly or indirectly, by BISYS to Client as part of the Services (the "BISYS Products") are the exclusive and confidential property of BISYS or the third parties from whom BISYS has secured the right to use such computer programs and documentation.

B. A personal, non-exclusive, non-transferable right and license is being granted to Client to use, during the term of this Agreement, any applications software programs included in the BISYS Products (the "Application Programs") which are delivered to Client as part of the Services solely for Client's own business usage. Client shall not have any interest in the Applications Programs except for this limited license.

C. Client shall receive all improvements, enhancements, modifications and updates to any Applications Programs which are delivered to Client as part of the Services if, and as, made available by BISYS to its clients generally. All such improvements, enhancements, modifications and updates shall be delivered to Client in the form of a computer media, which media shall be provided to Client by BISYS and shall be installed by Client. If Client fails to install any such media within 45 days of its receipt from BISYS, BISYS shall have no further obligation to provide Client with improvements, enhancements, modifications or updates to such Application Programs.

D. Client acknowledges that it shall be deemed a sublicensee of BISYS for any systems software programs included in the BISYS Products (the "Systems Programs") which are delivered to Client as part of the Services. Client accepts a sublicense from BISYS of the Systems Programs on a personal, non-exclusive, non-transferable basis with the right to use, during the term of this Agreement, such Systems Programs solely in connection with the Services.

E. Client shall not copy, in whole or in part, any BISYS Products or related documentation, whether in the form of computer media, printed or in any other form, except for copies to used by Client exclusively for its own internal purposes. Client shall not make any alteration, change or modification to any BISYS Products.

F. Client shall treat as confidential and will not disclose or otherwise make available any of the BISYS Products or any trade secrets, processes, proprietary data, information or documentation related thereto including, without limitation, any flow charts, logic diagrams or source code (collectively the "Confidential Information"), in any form, to any person other than employees of Client. Client will instruct its employees who have access to the BISYS Products and the Confidential Information to keep the same confidential by using the same care and discretion that Client uses with respect to its own confidential property and trade secrets. Upon the termination of this Agreement for any reason, Client shall return to BISYS any and all copies of the BISYS Products and the Confidential Information which are in its possession.

## 11. GOVERNMENTAL AGENCIES.

A. Client shall provide all required notices to the appropriate regulatory authorities concerning the initiation or termination of this Agreement, or of any substantial changes in the Services being provided to Client. BISYS agrees that any and all Client Files maintained by it for the Client pursuant to this Agreement shall be available for inspection by the appropriate regulatory authorities and Client's internal auditors and independent public accountants, upon prior written notice to BISYS. All costs incurred by BISYS in the preparation of data for inspection, examination or audit will be charged to Client at BISYS' then standard rates for such services.

B. BISYS shall provide annually to the appropriate regulatory authorities any Third Party Review Reports prepared by independent public accountants with respect to the Services performed by BISYS at the Data Center and copies of BISYS' audited financial statements. By entering into this Agreement, BISYS agrees that it extends to the Office of Thrift Supervision ("OTS") the same authority and responsibility (as applicable to Client) provided to the other regulatory agencies pursuant to the Bank Service Corporation Act, 12 U.S.C. 1867(C) relating to services performed by contract or otherwise.

C. If after the date hereof any modifications to the Services shall be required by law or by any governmental regulatory authority, BISYS shall, except to the extent such changes may be beyond the capability of the BISYS System to implement, conform the Services to be in compliance with such modified laws or governmental regulations. BISYS may, at its discretion, pass on, in whole or in part, on an equitable basis to all users of the Services (including Client) affected by any such modification the actual costs incurred by BISYS in making any such modification to the Services.

## 12. WARRANTY.

A. BISYS represents and warrants that the Services will conform materially to their design specifications and user documentation which may be changed from time to time. This warranty shall not extend to any of the computer programs, data bases and/or BISYS supported files used by BISYS in connection with providing the Services to Client hereunder which have been altered, changed or modified in any way, without BISYS' prior written consent in each instance.

B. EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 13. LIMITATION OF LIABILITY.

A. The remedies specified in this Agreement constitute Client's sole and exclusive remedies in the event of any alleged defaults by BISYS under this Agreement. BISYS' sole liability, if any, for damages (monetary or otherwise) resulting from claims made by Client or any third party arising from or related to any and all causes not covered by the foregoing remedies shall be limited to the lesser of (i) the amount of actual damages incurred by Client or (ii) an amount which shall not exceed the charges paid by Client during the six (6) month period immediately preceding the event from which such liability arose for the Services performed which gave rise to the claim.

B. IN NO EVENT WILL BISYS BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH CLIENT MAY INCUR OR EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF BISYS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 14. PATENT AND COPYRIGHT INDEMNIFICATION.

BISYS will hold Client harmless and, at its own expense, will defend any action brought against Client based on a claim that the Services used within the scope of this Agreement infringe a United States patent or copyright provided Client notifies BISYS promptly in writing of the claim, BISYS has sole control of the defense of the action and all negotiations for its settlement or compromise, and Client cooperates with BISYS in the defense of the action. In the event any of the Services becomes, or in BISYS' opinion is likely to become, the subject of a claim of infringement of patent or copyright, BISYS, at its option, may (i) secure for Client the right to continue using such Service(s), (ii) replace or modify such Services to make it or them non-infringing, (iii) cease providing the affected Service(s) or (iv) if none of the foregoing options is commercially reasonable, in BISYS' opinion, terminate this Agreement. If BISYS exercises its option hereunder to terminate this Agreement, such termination shall be at no penalty to BISYS except that BISYS shall provide the Deconversion assistance described in Paragraph 9(B) at no charge to Client.

## 15. INSURANCE.

BISYS shall maintain, during the term of this Agreement, $10,000,000 of coverage under a Blanket Crime Policy covering fraudulent and dishonest acts committed by its employees for which it is legally responsible. BISYS shall maintain, on its own behalf, insurance coverage for loss from fire, disaster, or other causes contributing to interruption of normal services. Client, at its own expense, will maintain all insurance and fidelity bonds required by the applicable regulatory authorities.

## 16. DEFAULT; REMEDIES UPON DEFAULT.

A. Any of the following events will constitute an "Event of Default" under the Agreement: (i) non-payment of any amounts due hereunder to BISYS by Client; (ii) non-performance of any of Client's or BISYS' other material obligations hereunder; (iii) if any representation or warranty of Client or BISYS is materially breached; (iv) if Client or BISYS files a petition for bankruptcy or becomes the subject of an involuntary bankruptcy petition which is not vacated within 60 days of filing,

or becomes insolvent; or (v) if any substantial part of Client's or BISYS' property becomes subject to any levy, seizure, assignment, application or sale for or by any creditor or governmental agency.

B.  Upon occurrence of an Event of Default under the Agreement, the non-defaulting party may, at its option, terminate this Agreement provided at least 30 days (or longer period as may be required by the applicable regulatory authorities) prior written notice has been given to the other and such default has not been cured within such period.  Upon such termination by BISYS, BISYS may declare all amounts due and to become due hereunder immediately due and payable.  The remedies contained in this Paragraph 16 are cumulative and in addition to all other rights and remedies available to the parties under this Agreement or by operation of law or otherwise.

## 17.  FORCE MAJEURE

BISYS shall not be liable or deemed to be in default for any delay or failure to perform under this Agreement or for interruption of the Services resulting, directly or indirectly, from any cause beyond BISYS' reasonable control.

## 18.  GENERAL.

A.  BISYS shall provide Client upon written request, copies of The BISYS Group, Inc.'s (BISYS' parent corporation) current audited financial statements.

B.  Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement.  This Agreement contains the entire agreement of the parties with respect to its subject matter and supersedes all existing agreements and all other oral, written or other communications between them concerning its subject matter.  This Agreement shall not be modified in any way except by a writing signed by both parties.

C.  The failure by either party hereto to insist upon strict performance of any of the provisions contained herein shall in no way constitute a waiver of its rights as set forth herein, at law or equity, or a waiver by either party of any other provisions or subsequent default by the other party in the performance of or compliance with any of the terms and conditions set forth herein.

D.  This Agreement may not be assigned by either party, in whole or in part, without the prior written consent of the other which consent shall not be unreasonably withheld.  It shall not be deemed an assignment requiring consent if the stock of either is sold, or all, or substantially all, of the assets are sold so long as such sale does not materially negatively affect the basis of the financial bargain upon which this Agreement is based as of the date hereof and such sale does not materially negatively affect the provision of the Services hereunder.  If there is such a negative impact, then the sale shall be deemed an assignment requiring consent as set forth above.  This Agreement shall be binding upon and shall inure to the benefit of BISYS and Client and their respective successors and permitted assigns.

E.  If any provision of this Agreement (or any portion thereof) shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of this Agreement shall not in any way be affected or impaired thereby.

F.  The headings in this Agreement are intended for convenience of reference and shall not affect its interpretation.

G.  The individuals executing this Agreement on behalf of BISYS and Client do each hereby represent and warrant that they are duly authorized by all necessary action to execute this Agreement on behalf of their respective principals.

H.  Client acknowledges that a breach of any of its obligations under this Agreement relating to the BISYS Products and/or the Confidential Information will cause BISYS irreparable injury and damage and therefore may be enjoined through injunctive proceedings in addition to any other rights or remedies which may be available to BISYS, at law or in equity and BISYS grants Client the same rights with respect to a breach of BISYS' obligations relating to the confidentiality of Client Files.

I.  During the term of this Agreement, neither party hereto shall, directly or indirectly, solicit or encourage to leave, any employee of the other without prior written consent, which consent shall not be unreasonably withheld.

BISYS, INC.

Agreed to: _____
              (signature-Authorized Officer)

Name: ___W. W. Neville___
              President

Title: _____  Date: _5/18/97_
        (print or type)

ALLIANCE FSB

Agreed to: ___Lawrence M Chlum___
              (signature-Authorized Representative)

Name: ___Lawrence H. Chlum___
              (print or type)

Title: _President_  Date: _3/16/97_
        (print or type)

THIS AGREEMENT SHALL BECOME EFFECTIVE UPON BEING SIGNED BY AUTHORIZED OFFICERS OF BISYS AND CLIENT.
BISYS' MARKETING REPRESENTATIVES DO NOT HAVE THE AUTHORITY TO BIND BISYS.



# PRICE LIST CONTENTS

## July 1, 1996

EXHIBIT
" B "

i

STANDARD SERVICES PRICE LIST ...........................................................................................A-1
   DEPOSITS ........................................................................................................................A-3
      Transaction Accounts.........................................................................................A-3
      Savings, Time Deposit / Certificates of Deposit ...............................................A-4
      All Deposits ........................................................................................................A-4
   LOANS ..............................................................................................................................A-7
      Commercial Loans .............................................................................................A-7
      Installment Loans ..............................................................................................A-7
      Mortgage Loans .................................................................................................A-8
      Construction Loans ............................................................................................A-10
      All Loans............................................................................................................A-10
   GENERAL LEDGER ..........................................................................................................A-11
      Total Financial Manager (TFM).........................................................................A-11
      TotalPlus Financial System (TFS).....................................................................A-11
   OTHER SERVICES............................................................................................................A-12
      Automatic Transaction Generation and Posting................................................A-12
      Customer Information File (CIF)..........................................................................A-12
      Target Plus ........................................................................................................A-12
      Safe Deposit Box...............................................................................................A-13
   STANDARD DOCUMENTATION.........................................................................................A-14

SPECIAL SERVICES PRICE LIST...........................................................................................B-1
   REMOTE GENERAL LEDGER .........................................................................................B-2
   ON-LINE COMMUNICATION SUPPORT ..........................................................................B-2
   REPORT / FILE CREATION / TRANSFER ........................................................................B-2
   MISCELLANEOUS SERVICES..........................................................................................B-3
   DOCUMENTATION............................................................................................................B-6
   DEPOSITS .........................................................................................................................B-9
   INSTALLMENT LOANS .....................................................................................................B-10
   MORTGAGE LOANS .........................................................................................................B-10
   OTHER SERVICES............................................................................................................B-11
   CONVERSION / DECONVERSION SERVICES.................................................................B-12



# STANDARD SERVICES PRICE LIST

## July 1, 1996

### MINIMUMS

All standard services are billed per month except where otherwise indicated. The minimum charge for Standard Services for each BISYS Client is $3,000.00 per month, allocated as follows:

| | |
|---|---|
| Deposits | $1,500.00 |
| Commercial Loans | $300.00 |
| Installment Loans | $300.00 |
| Mortgage Loans | $750.00 |
| General Ledger | $150.00 |

*Waived*

### IMPLEMENTATION FEES

Implementation Fees will be based on Conversion/Deconversion Fees and Implementation Fees detailed under the Special Services section.

### REPORT PRINTING

BISYS standard prices include Remote Transmission to Client's site for Client-site printing or one original microfiche and one copy of microfiche (where available) in lieu of Client-site printing.

**FORMS**

All blank stock forms used at BISYS' data center where the Services are being performed (the "BISYS Center") will be supplied to Client by BISYS without additional charge. All forms that are preprinted or specially designed for Client's exclusive use, all forms bearing Client's name, and all forms printed at Client's location will be supplied to or by Client at Client's expense.

## TRAVEL EXPENSES ‡

Travel and lodging expenses incurred by BISYS associates in connection with installation and/or conversion of BISYS Services or Products will be charged to Client in accordance with BISYS' standard policy for reimbursement of such expenses.



# DEPOSITS

## Transaction Accounts
## (DDA, MMDA,NOW, SUPER NOW, MONEY MARKET)

**Account Base**

|  |  |  |  |  |
|---|---|---|---|---|
| 1 | - | 15,000 | .26 | Per Account on File |
| 15,001 | - | 30,000 | .23 | Per Account on File |
| 30,001 | - | 45,000 | .20 | Per Account on File |
| 45,001 | - | 60,000 | .17 | Per Account on File |
| 60,001 | + |  | .14 | Per Account on File |

**Account Analysis**                                    100.00     Base
                                                          .50     Per Account

**Check Register on Statement**                           .002     Per Transaction

**DDA Statement Production**
    Per Statement Cycle Over Five (5)          30.00     Per Cycle
    Interim Statements (Snapshot and Reset)    100.00     Per Month
                                                         1.00     Per Account Selected

**Item Processing Interface**                            100.00     Per Month

**Line-Of-Credit Processing**                             50.00     Base
                                                          .36     Per Account (see IL per account)
                                                          .05     Per Automatic Loan Disbursement
                                                         .125     Per Automatic Payment Generated

**Transaction Base**

|  |  |  |  |  |
|---|---|---|---|---|
| 1 | - | 75,000 | .018 | Per Transaction |
| 75,001 | - | 150,000 | .015 | Per Transaction |
| 150,000 | + |  | .012 | Per Transaction |

**Variable Interest Rate Processing**                     .05     Per Account
**On Line History (60 Days)**                             .NC

## Savings, Time Deposit / Certificates of Deposit

Account Base

|  |  |  |  |  |
|---|---|---|---|---|
| 1 | - | 15,000 | .15 | Per Account on File |
| 15,001 | - | 30,000 | .14 | Per Account on File |
| 30,001 | - | 45,000 | .13 | Per Account on File |
| 45,001 | - | 60,000 | .12 | Per Account on File |
| 60,001 | + |  | .11 | Per Account on File |

| | | | |
|---|---|---|---|
| Interest Checks | 50.00 | Base | |
| | | .02 | Per Account with Check Disposition |
| On-Line History | | | |
| Savings (4 months) | | .02 | Per Account |
| IRA Savings (24 months) | | .02 | Per Account |
| CDs Term History (term + 1 month or 24 months) | | .03 | Per Account |
| IRA CDs (term + 1 month or 24 months) | | .03 | Per Account |
| Retirement Accounts | | 50.00 | Base |
| | | .10 | Per Account |
| Retirement Distribution Transactions | | .035 | Per Transaction |
| Statement Production | | 50.00 | Per Run |
| | | .05 | Per Statement Page |
| | | .06 | Per Laser Statement Page |
| Variable Interest Rate Processing | | .05 | Per Account |

## All Deposits

| | | | |
|---|---|---|---|
| Combined Statements | | | |
| With Financial Summary Only | | .04 | Per Statement |
| With Financial Summary-SV/CD/DDA Activity | | .0825 | Per Statement Per Month ($100 MINIMUM) |
| Production of Activity Reports (TS3320) | | .015 | Per Active Account Per Month (Daily) |
| | | .01 | Per Active Account Per Month (Weekly) |
| | | .NC | Monthly |
| EFT Notices | 50.00 | Base | |
| | | .05 | Per Notice |
| History Retention--Additional | | .01 | Per Additional Month Per Account with History Retention Beyond Standard Retentions |
| Over Draft Reminder Notices | | 50.00 | Base |
| | | .05 | Per Notice |
| Currency Reporting | | 200.00 | Per Month |

| | | |
|---|---|---|
| Account Consolidation Report | 100.00 | Per Run |
| | .0075 | Per Deposit Account on File |
| Anniversary Processing | 100.00 | Base |
| | .05 | Per Anniversary Account |
| Audit Confirmations | 75.00 | Base Per Run |
| Detail | .15 | Per Account |
| Summary | .05 | Per Account |
| Notices | .05 | Per Account |
| Custom Extracts | 35.00 | Per Extract |
| Bank Check Reconciliation Tape | 75.00 | Per Run |
| CD Renewal Confirmation | 25.00 | Per Run |
| | .10 | Per Notice |
| Proxy Reporting | 100.00 | Per Run |
| | .015 | Per Account Selected |
| Realty Trust / Surrogate Processing | 50.00 | Per Month |
| | .03 | Per Escrowee/Minor Account |
| Retirement Account Statements | 50.00 | Per Run |
| | .05 | Per Statement Page |
| Savings Service Charges | 50.00 | Per Month |
| | .035 | Per Account Assessed Service Charge |
| Tenant Rent Security Processing | 75.00 | Per Month |
| | .03 | Per Tenant or Landlord |
| Tax Compliance - Withholding | 100.00 | Base Per Quarter |
| | .10 | Per Account Withheld Per Quarter |
| | .10 | Per Record on File Per Quarter (OTC) |
| W9Bs | 100.00 | Base |
| Notices Received by Report | 150.00 | Base |
| Notices Received by Tape | Per Account | |
| TIN Flag           .01 | | |
| Mailing Label | .02 | Per Account |
| Mailer | .40 | Per Account |
| Account Reconciliation Processing (ARP) | 200.00 | Base |
| | 1.00 | Per Account Per Month |
| Full Reconciliation | .02 | Per Item |
| Range/Paid Only Reconciliation | .01 | Per Item |
| Transmission Output Tape | 30.00 | Per Tape |

Item Processing Interface
    Exception item pull | 20.00 | Per File
 | .03 | Per Detail Record Transmission
    Daily Activity file | 20.00 | Per File
 | .03 | Per Detail Record Transmission
    Statement Rendering | 20.00 | Per File
 | .03 | Per Detail Record Transmission

NSF/UCF Qualification Report | .03 | Per Account Per Month ($100 MINIMUM)

Sweep Accounts | 100.00 | Base
 | .50 | Per Account

1099 Production | 100.00 | Base Per Run
 | .065 | Per Account on File
 | | Plus Forms Charge and Rendering
Charge

1099R Production | 100.00 | Base Per Run
 | | Plus Forms Charge and Rendering
Charge

5498 Production | 100.00 | Base Per Run
 | | Plus Forms Charge and Rendering
Charge

Interactive Exception Handling | .025 | Per Action Item ($100 MINIMUM per Month)

OTS/FDIC Reports
    Quarterly Run | .NC |
    Additional Runs | 100.00 | Base
 | .025 | Per Account Used in Compiling Data

File Maintenance History | .003 | Per Record ($50 MINIMUM)*

Transaction Processing Notices | .05 | Per Notice

# LOANS

## Commercial Loans

| Account Base | | |
|---|---|---|
| | 300.00 | Per Month |
| | .90 | Per Note |

## Installment Loans

Account Base

| | | | | |
|---|---|---|---|---|
| 1 | - | 15,000 | .36 | Per Account on File |
| 15,001 | - | 30,000 | .33 | Per Account on File |
| 30,001 | - | 45,000 | .30 | Per Account on File |
| 45,001 | - | 60,000 | .27 | Per Account on File |
| 60,001 | + | | .24 | Per Account on File |

| | | |
|---|---|---|
| Adjustable Installment Loans | 100.00 | Base |
| | .11 | Per Loan on File |
| Commercial Loan Processing | .50 | Per Account on file |

Coupon Loans  MICR/OCR .01  Per Coupon Loan Account on File

| | | |
|---|---|---|
| Customer Notices and Billings | 50.00 | Per Run |
| (Monthly, Maturity, Floating Rate, LOC, etc.) | .05 | Per Notice / Bill |
| Dealer Reporting and Floor Planning | 50.00 | Base Per Month |
| | .05 | Per Account |
| Investor Reporting | 100.00 | Base Per Month |
| | .07 | Per Account |
| Multi-Investor Reporting | 50.00 | Base Per Month |
| | .05 | Per Account |
| Pool Reporting | 50.00 | Base Per Month |
| | .05 | Per Account |
| Lock Box--Stop Tape Production | 25.00 | Per Run |
| | .01 | Per Account |
| On-Line History (Eighteen (18) months) | .03 | Per Account on File |
| On-Line History (Life) | .01 | Per Account per 6 Months Segment Beyond Standard Retention |
| Student Loan Processing | .05 | Per Account |
| Annual IL Notice | 75.00 | Per Run |
| | .05 | Per Notice |
| Annual IL Statement | .25 | Per Account |

| | | |
|---|---|---|
| Automatic Student Loan Check Printing | 50.00 | Per Run |
| | .05 | Per Check |
| Classification Report | 25.00 | Per Run |
| | .01 | Per Account |
| Credit Bureau Reporting | 50.00 | Base Per Credit Bureau |
| FASB #91 Processing | 50.00 | Per Month |
| | .05 | Per Account using Fee/Cost Process |
| Loan 10K Report | 100.00 | Per Run |
| | .01 | Per IL Account on File |
| Overdraft/LOC Loan Notice | .05 | Per Notice |
| Savings Account Loan Trial Balance | 75.00 | Per Run |
| | .01 | Per Account Reported |
| Simple Interest Loan Analysis | 75.00 | Per Run |
| | .01 | Per Account Selected |

## Mortgage Loans

| | | | |
|---|---|---|---|
| Account Base | | | |
| 1 | - | 15,000 | .29 | Per Account on File |
| 15,001 | - | 30,000 | .26 | Per Account on File |
| 30,001 | - | 45,000 | .23 | Per Account on File |
| 45,001 | - | 60,000 | .20 | Per Account on File |
| 60,001 | + | | .17 | Per Account on File |

| | | |
|---|---|---|
| Tax and Insurance System | .06 | Additional Per Account on File |
| Coupon Loans MICR/OCR | .01 | Per Coupon Loan Account on File |
| Escrow Analysis | .06 | Additional Per Account on File |
| Adjustable Loans | 100.00 | Base |
| | .11 | Per AML Loan on File |
| | .05 | Per Notice |
| Bill and Receipt Processing | 50.00 | Base |
| | .05 | Per Notice |
| Bi-Weekly/Weekly Loans | .NC | Standard ML Charges |
| Collection Loans | 100.00 | Base |
| | .05 | Per Account Per Month |
| Investor Reporting | 100.00 | Base |
| | .15 | Per Account |
| Multi-Investor Reporting | 50.00 | Base |
| | .10 | Per Account |
| Automatic Posting of ML Investor Transactions | 25.00 | Base |
| | .05 | Per Generated Transaction |
| EDI Reporting for FHLMC, FNMA | 100.00 | Per Month |

(Investor, Delinquency)

| | | |
|---|---|---|
| FHLMC MIDANET Remittance Tape (Form 308) | 50.00 | Per Month |
| GNMA Tape | 50.00 | Per Run |
| GNMA/FNMA Pools | 50.00 | Base |
| | .10 | Per Account |
| GNMA Remittance Checks | 50.00 | Per Run |
| | .01 | Per Check Processed |

NDC Tape          50.00          Per Run
Special Investor Tapes 150.00     Per Run

| | | |
|---|---|---|
| Lock Box Stop Tape Production | 25.00 | Per Run |
| | .01 | Per Account |
| On-Line History (Eighteen (18) months) | .03 | Per Account on File |
| Report to Credit Bureaus of Delinquencies and Foreclosures | 200.00 | Per Month / up to Six (6) Credit Bureaus |
| Additional Coupon Processing Runs | 75.00 | Per Run |
| AML Reminder Notice Worksheet | 75.00 | Per Run |
| | .015 | Per AML Account on File |
| Annual Mortgage Borrower Statements | .25 | Per Account |
| Credit Bureau Reporting - Monthly | 50.00 | Per Credit Bureau |
| FASB #91 Processing | 50.00 | Per Month |
| | .05 | Per Account using Fee/Cost Process |
| FHLMC Form 11 on Magnetic Tape | 75.00 | Per Run |
| FHLMC Submission Schedule | 50.00 | Per Run |
| | .01 | Per Account Selected |
| Instructions for Payer Stuffer | 25.00 | Base |
| | .03 | Per Stuffer |
| Interest on Escrow System | 250.00 | Base |
| | .035 | Per Account on File |
| Investor Reporting Tape Production | 75.00 | Per Run |
| LASERNET Remittance Tape | 50.00 | Per Month |
| Loan Solicitation Tape Production | 75.00 | Per Run |
| Loan Solicitations on Printed Form | 150.00 | Per Run |
| | .05 | Per Account |
| Loan 10K Report | 100.00 | Per Run |
| | .01 | Per ML Account on File |
| ML Available for Sale Report | 75.00 | Per Run |
| | .01 | Per Account Selected |
| Tax Bill Processing Tape Production | 75.00 | Per Run |

## Construction Loans

| | | |
|---|---|---|
| Account Base | 100.00 | Base |
| | .50 | Per Account |
| Notices | .05 | Per Notice |
| On-Line History (Eighteen (18) months) | .03 | Per Account on File |

## All Loans

| | | |
|---|---|---|
| 1098, 1099A, 1099s for OTC Records | 75.00 | Per Run |
| | | Plus Forms Charge and Rendering |
| Charge | | |
| 1098 Production | 50.00 | Base Per Run |
| | | Plus Forms Charge and Rendering |
| Charge | | |
| Additional History Retention | .01 | Per Account Per 6 Months Segment |
| | | Beyond Standard Retention |
| Letter Writing          .05 | Per Letter | |
| Letter Writing Download | 35.00 | Per Run |
| | .015 | Per Letter |
| File/Maintenance History | .0003 | Per Record ($50 MINIMUM) |
| Multi-Borrower Report | | |
|    Monthly Production | 75.00 | Per Month |
|    Weekly/Daily Production | 100.00 | Per Month |

# GENERAL LEDGER

**Host General Ledger**

## Total Financial Manager (TFM)

**1.  Base Windows Version Fee**

| | Single Station | | LAN |
|---|---|---|---|
| Core Financial Package[1] | $    400.00 | $ | 600.00 |
| Includes General Ledger, Accounts Payable, and Fixed Assets | | | |
| | | | |
| Independent Copies (If purchased individually) | | | |
| General Ledger | $    250.00 | $ | 400.00 |
| Accounts Payable | $     85.00 | $ | 125.00 |
|     Optional - ACH Module | $     25.00 | $ | 25.00 |
|     Optional - Create-a-Check | $     50.00 | $ | 50.00 |
| Accounts Payable Plus | $    135.00 | $ | 160.00 |
|     Optional - ACH Module | $     25.00 | $ | 25.00 |
|     Optional - Create-a-Check | $     50.00 | $ | 50.00 |
| Fixed Asset | $     85.00 | $ | 125.00 |
|     Optional - Bar Coding | $     15.00 | $ | 15.00 |
| Investment Accounting (DOS Version) | $    150.00 | $ | 175.00 |
| Safe Deposit Box Accounting (DOS Version) | $     50.00 | $ | 75.00 |
|     Optional - ACH Module | $     25.00 | $ | 25.00 |
| Shareholder Accounting (DOS Version) | $     50.00 | $ | 75.00 |

Upgrade Current DOS to Windows Monthly Fee

| | Single Station | | LAN |
|---|---|---|---|
| Old Core Financial Package | $    500.00 | $ | 775.00 |
| Includes General Ledger, Accounts Payable, Fixed Assets, and Investment Accounting (DOS Version) | | | |
| | | | |
| Independent Copies (If purchased individually) | | | |
| General Ledger | $    250.00 | $ | 350.00 |
| Accounts Payable | $     85.00 | $ | 125.00 |
| Accounts Payable Plus | $    135.00 | $ | 160.00 |
| Fixed Asset | $     85.00 | $ | 125.00 |

**3.  Per Transaction Fee (For G/L Integration only)**
Based on number of summarized output transactions processed
from the TOTALPLUS® G/L interface:

| | | | |
|---|---|---|---|
| Transaction Base | Est.trans @_____ $ | 0.025 | Per Transaction, Per Month |
| TotalPlus Online G/L History | Est.trans @_____ | $ | 0.001 Per Transaction, Per Month |

## TotalPlus Financial System (TFS)

**TFS General Ledger - Unlimited**

**1.  Base Fee**

| Account Base | | |
|---|---|---|
| First 3,000 Accounts | $ | 1,500.00 |
| Accounts over 3,000 | $ | .25 |

---

[1] Monthly charge of $450.00 or $650.00 if Accounts Payable Plus is substituted for regular Accounts Payable.

Transaction Base
    TotalPlus G/L Interface Transactions[1]           $    .025  each

Added Functions
    Multiple Corporations                     $   100.00  each
    Custom Transaction Reporting (ViewPrint)   $   500.00
    Allocations                            $   250.00
    Online Query                         $   200.00
    TFS PC Connections (PCLink)           $    50.00

## TFS General Ledger - Limited

1. **Base Fee**

Account Base
    First 1-500 Accounts                $     1.50  each
    Next 501-1,000 Accounts          $     .50  each
    Accounts over 1,000              $     .15  each

Transaction Base
    TotalPlus G/L Interface Transactions[1]           $    .025  each

Added Functions
    Multiple Corporations                     $   100.00  each
    Custom Report Writing                $   300.00
    Custom Online Query Writing          $   200.00
    Allocations                            $   250.00
    Custom Transaction Reporting (ViewPrint)   $   500.00
    TFS PC Connection (PCLink)           $    50.00

# OTHER SERVICES

## Automatic Transaction Generation and Posting

| | | |
|---|---|---|
| From or To ACH | 100.00 | Base |
| | .035 | Per Transaction |
| Other Source Transactions | 15.00 | Per Run |
|      (Payroll, Lockbox, etc.) | .035 | Per Transaction |
| System-generated Transactions (excludes Interest, DDA transactions and Service Charges Escrow Analysis, and T&I) | .035 | Per Transaction |
| Totalmatic | 50.00 | Base |
| | .05 | Per Account |
| | .05 | Per Draft Printed |
|     Internal Transfers/External Drafts/ACH | .035 | Per Transaction |

ACHIPS
   Return Item Module                        .25   Fee Per Return ($50 MINIMUM)
                                             .001  Per Item in History

   Pre-Processing Module .25         Fee Per Return ($50 MINIMUM)
                                             .001  Per Item in History

   Transit Processing Module                    .035  Per Transaction Processed

---

## Customer Information File (CIF)

Account Base                                .025  Per Account on File Per Month
                                         .10  Per On-Line Memo Per Month

CIF Interface From Third Party             50.00  Per Upload
                                         .01  Per Record Uploaded

---

## Target Plus

TARGET-PLUS System

   Twenty (20) Reports Per month          300.00  Per Month
                                         .015  Per Account Selected Per Month

## Safe Deposit Box

Base Fee                          200.00    Base
Rented                               .10    Per Box
Unrented                             .03    Per Box

# STANDARD DOCUMENTATION

One (1) copy of each manual for Services implemented at conversion.

See Page B-6 for pricing of additional manuals.

# STANDARD DOCUMENTATION

One (1) copy of each manual for Services implemented at conversion.


See Page B-6 for pricing of additional manuals.



# SPECIAL SERVICES PRICE LIST

# July 1, 1996

## REPORT PRINTING

BISYS standard prices include Remote Report Transmission to Client's site for Client-site printing or one original microfiche and one copy of microfiche (where available) in lieu of Client-site printing.

## FORMS

All blank stock forms used at BISYS' data center where the Services are being performed (the "BISYS Center") will be supplied to Client by BISYS without additional charge. All forms that are preprinted or specially designed for Client's exclusive use, all forms bearing Client's name, and all forms printed at Client's location will be supplied to or by Client at Client's expense.

## TRAVEL EXPENSES ‡

Travel and lodging expenses incurred by BISYS associates in connection with installation and/or conversion of BISYS Services or Products will be charged to Client in accordance with BISYS' standard policy for reimbursement of such expenses.

# SPECIAL SERVICES

## REMOTE GENERAL LEDGER

| | | |
|---|---|---|
| Transaction Base | 0.025 | Per Transaction, Per Month |
| Online G/L Transaction History | 0.001 | Per Transaction Stored, Per Month |
| Asset / Liability Maturity and Repricing Download | 200.00 | Per Run |
| | .0025 | Per Account Per Run |
| General Ledger Daily File Transfer to Client-Site GL | 500.00 | Per Month - Transmission or Tape |

## ON-LINE COMMUNICATION SUPPORT

| | | |
|---|---|---|
| BISYS Site Standard Disaster Recovery | | 4% Per Month of Monthly Charges. Invoiced Per the Standard Services Price List |
| First Terminal | 50.00 | Each Location |
| Additional Terminals | | |
| Up to 100 | 30.00 | Each Terminal |
| 100 or More | 27.50 | Each Terminal |

## REPORT / FILE CREATION / TRANSFER

| | | |
|---|---|---|
| Client-Site Report Delivery | 65.00 | Per Month |
| Microfiche | | |
| First Copy | .63 | Per Fiche |
| First Copy | .0184 | Per Page Fiched |
| First Copy | .4725 | Per Copy |
| Report Creation Consulting | 100.00 | Per Hour |
| Special Reports and File Adjustments | 350.00 | Per Run in Addition to Programming/ Development |
| | .035 | Per Transaction Generated or Account Selected |
| TARGET-PLUS System | | |
| Data File Transfers | 35.00 | Per Data File |
| | .015 | Per Account |
| Remote Print Report | 40.00 | Per Report/Data File |
| | .40 | Per Page |
| Remote Print Labels | 35.00 | Base |
| | .01 | Per Label |
| Paper Produced by BISYS | 50.00 | Per Report |

| Microfiche | .63 | Per Page |
| | 50.00 | Per Report |
| | .0184 | Per Page Fiched |
| | .4725 | Per Copy |
| Previous Day's Report Information | 30.00 | In Addition to Production Charges |
| BISYS Report Criteria Setup Fee | 75.00 | Per Report |

## MISCELLANEOUS SERVICES

| Adding/Changing Terminals/Branches to<br>Existing Network | 150.00 | Per Network Change |
| Additional Runs of Standard Reports | 50.00 | Base |
| | .015 | Per Account ($750 MAXIMUM) |
| Alpha List | 75.00 | Base |
| | .01 | Per Account |
| | 35.00 | Per Extra Sort/Extract |
| Annual Transaction Journal and Exception Report | 100.00 | Base |
| | .025 | Per Account |
| | .0005 | Per Cumulative Transaction |
| Audit Confirmations | 75.00 | Base Per Run |
| Detail | .15 | Per Account |
| Summary | .05 | Per Account |
| Notices | .05 | Per Account |
| Custom Extracts | 35.00 | Per Extract |
| Available Special Reports from Special Reports List | 75.00 | Base |
| | .015 | Per Account on File ($750 MAXIMUM) |
| Combined CIF Alpha List | 100.00 | Base |
| | .015 | Per Account |
| | 25.00 | Per File Used |
| Computer Test Time | 150.00 | Per Half Hour or Part Thereof |
| Control Table Updates (eg. SEPART) | 75.00 | Per Update |
| Data Center Prepared Output (Reports/Notices) | .045 | Per Page Printed ($500 MINIMUM Per Month) |
| Host Signature Support (signatures only) | 50.00 | Per Month |
| | .0075 | Per Signature on File |
| Invoice Processing Fee | 50.00 | Per Month |
| Labels | 75.00 | Base |
| | .02 | Per Label - Cheshire |
| | .03 | Per Label - Gummed |
| | 35.00 | Per Extra Sort |
| Magnetic Tape Files | 350.00 | Per File |

|  | | |
|---|---|---|
|  | .005 | Per Account |
| Missing Tax Identification Number | 75.00 | Base |
| Request Document (Form 3435) | .015 | Per Account on File |
| Processing Coordination | 100.00 | Per Hour |
| ReconPlus - Ongoing Maintenance/Usage Fees | 200.00 | Base Fee Per Month |

**Fee Per Account**

| | |
|---|---|
| 0 - 50 Accounts | 2.00 |
| 51 - 100 Accounts | 1.60 |
| 101 - 200 Accounts | 1.30 |
| More than 200 Accounts | 1.00 |

**Fee Per Transaction (Non-ATM)**

| | |
|---|---|
| 0 - 25,000 | .020 |
| 25,001 - 50,000 | .016 |
| 50,001 - 75,000 | .013 |
| More than 75,000 | .010 |

**Per ATM Transaction** .005

| | | |
|---|---|---|
|  | .0005 | Extended History Per Record |
|  | 30.00 | Per Output Tape |

| | | |
|---|---|---|
| Request for Tax Identification | | |
| Deposits | 100.00 | Base |
| Trial Balance (on microfiche) | .03 | Per Account Selected |
| Cheshire Labels | .01 | Per Label |
| Gummed labels | .02 | Per Label |
| W9 Stuffers | .05 | Per Account Selected |
| W9 Prestuffed Mailer | .10 | Per Account Selected |
| Worksheet | .03 | Per Account Selected |
| MLs and ILs | 100.00 | Base |
| Missing TIN Report | .03 | Per Account Selected |
| TIN Certification Request Notice | .05 | Per Account Selected |
| Cheshire Labels | .01 | Per Label |
| Gummed Labels | .02 | Per Label |
| Special Reports Requested by Auditors or Federal Examiners | | Time and Materials |

| | | |
|---|---|---|
| Extended/Sunday/Holiday Processing | 2,500.00 | Per Month |

Supplementary Education and Training Programs

| | | |
|---|---|---|
| Corporate Training Center | 500.00 | Per Day ‡ |
| Regional Training Center | 650.00 | Per Day ‡ |
| Client-Site | 1,000.00 | Per Day ‡ |

| | | |
|---|---|---|
| System Design and Programming | 100.00 | Per Hour ‡ |

Terminal Support

| | | |
|---|---|---|
| IBM 4700 Software Usage Fees | 125.00 | Per Controller Per Month |
| UNISYS FSA Software Support | | (Special Quote) |
| ISC Pinnacle | | (Special Quote) |

| | | |
|---|---|---|
| BISYS Test Bank Access (User 9900) | 100.00 | Per Month, Per Terminal |

| | | |
|---|---|---|
| Complete Test Bank | 500.00 | Per Month |

Third Party Audit Report

| | | |
|---|---|---|
| | 200.00 | Base |
| | .03 | Per Account on File |
| | 25.00 | Per Additional Copy |

Mailing

| | | |
|---|---|---|
| Mail Services - Postage (pass-thru) | .-- | First Class Postal Rate |
| Mail Service | .04 | Per Item |
| Statement Rendering | .10 | Per Item |

# DOCUMENTATION

| MANUAL | PRODUCT# | VOLUME COST | ANNUAL SUBSCRIPTION |
|---|---|---|---|
| **Cross-Lending** | | | |
| Asset Recovery - Volumes 1 & 2 | R01/R02 | $ 200 | $ 100 |
| **Mortgage Banking** | | | |
| Mortgage Loan Processing - Volumes 1 & 2 | M01/M02 | 160 | 100 |
| Mortgage Loan Reference Set *(Includes Reference/Transaction Codes)* | M03/M06 | 200 | 100 |
| Mortgage Loan Transaction Codes | M06 | 100 | 50 |
| Mortgage Loan Reports - Volumes 1 & 2 | M04/M05 | 200 | 100 |
| Mortgage Loan Origination Set (2 manuals) | M10/M11 | 125 | 50 |
| Total Loan Manager (TLM) | L01 | 75 | 15 |
| **Consumer Lending** | | | |
| Installment Loan Processing - Volumes 1 & 2 | I01/I04 | 160 | 100 |
| Installment Loan Reference | I02 | 100 | 50 |
| Installment Loan Reports | I03 | 100 | 50 |
| TCM Direct Lending | J03 | 80 | 40 |
| TCM Indirect Lending | J04 | 80 | 40 |
| TCM System Administrator's Guide | J05 | 80 | 40 |
| **Commercial Lending** | | | |
| Commercial Loan Processing (new) | C11 | 80 | 50 |
| Commercial Loan Reference (new) | C12 | 100 | 50 |
| Commercial Loan Reports (new) | C13 | 100 | 50 |
| Construction & Commercial Mortgage Loan, Volumes 1 & 2 | C21/C22 | 200 | 100 |
| **Deposits** | | | |
| Deposit Processing - Volumes 1 & 2 | D01/D09 | 160 | 100 |
| Savings/CD Processing | D02 | 75 | 25 |
| DDA Processing | D03 | 75 | 25 |
| Retirement Processing | D06 | 100 | 50 |
| Deposit Reference Set *(Includes Reference/Transaction Codes)* | D04/D07 | 200 | 100 |
| Deposit Transaction Codes | D07 | 100 | 50 |
| Deposit Reports - Volumes 1 & 2 | D05/D08 | 200 | 100 |
| Interactive Exception Handling (IEH) | T07 | 80 | 25 |
| ACH Item Processing (ACHIPS) | A03 | 80 | 25 |
| Safe Deposit | S11 | 100 | 25 |
| RECON-Plus Set (5 manuals) | R11-R15 | 250 | 100 |
| ARP | A01 | 75 | 15 |
| TBS Teller | B01 | 80 | 40 |
| TBS Platform | B02 | 80 | 40 |
| TBS Administrator's Guide | B03 | 80 | 40 |
| TBS AutoLoad | B06 | 80 | 40 |

| MANUAL | PRODUCT# | VOLUME COST | ANNUAL SUBSCRIPTION |
|---|---|---|---|
| **Electronic Banking** | | | |
| ATM Management | A11 | 100 | 35 |
| Card Management | A12 | 100 | 35 |
| Total Treasury Manager (TTM)—Auto Cash Manager | E01 | 80 | 20 |
| Accuret for ASCII | E02 | 30 | 10 |
| Accuret for Great Plains | E03 | 30 | 10 |
| Accuret for ACCPAC Plus | E04 | 30 | 10 |
| Accuret for Quicken 2.0 | E05 | 30 | 10 |
| Accuret for Lotus 1-2-3 | E06 | 30 | 10 |
| Accuret for Bedford | E07 | 30 | 10 |
| Accuret for Quicken 3 OR 4 | E08 | 30 | 10 |
| Accuret for Quicken 5 or Windows | E09 | 30 | 10 |
| Accuret for ACCPAC Easy | E10 | 30 | 10 |
| Accuret for ACCPAC BPI | E11 | 30 | 10 |
| Accuret for Peachtree Complete | E12 | 30 | 10 |
| Total Treasury Manager (TTM)—Auto Cash Transfer | A04 | 75 | 15 |
| | | | |
| **Relationship Banking** | | | |
| Customer Information File (CIF) | N01 | $ 100 | $ 40 |
| Total Marketing Manager (TMM) | S01 | 100 | 40 |
| TMM On-Site Householding | S07 | 75 | 15 |
| TMM Profit 2000 | S08 | 30 | 10 |
| TMM MaxiMarketer | S09 | 30 | 10 |
| | | | |
| **Cross-Application** | | | |
| Totalmatic | T01 | 100 | 40 |
| TOSS | T02 | 75 | 25 |
| CRA Compliance | S03 | 45 | 0 |
| Total Sales Manager (TSM) | S02 | 75 | 25 |
| TOTALPLUS Interface System | N02 | 100 | 40 |
| TOTALPLUS-Mail System - User's Guide | T20 | 75 | 25 |
| TOTALPLUS-Mail System - System Administrator's Guide | T21 | 75 | 25 |
| TOTALPLUS-Mail System - Tutorial | T22 | 35 | N/A |
| TOTALPLUS-Mail System - Quick Reference Card | T23 | 7.50 | N/A |
| TOTALPLUS-Mail System - Quick Start Guide | T24 | 5 | N/A |
| | | | |
| **Reporting** | | | |
| TargetPlus | T05 | 100 | 40 |
| TIMS/QM User's Guide | T16 | 75 | 15 |
| TIMS/QM System Administrator Guide | T17 | 75 | 15 |
| Total Remote Print (TRP) | T03 | 50 | 15 |
| Total Report Manager (TRM) | S04 | 50 | 15 |
| | | | |
| **Financial** | | | |
| General Ledger Interface | G01 | 125 | 35 |
| Asset/Liability Interface | A02 | 75 | 15 |
| TFM Accounts Payable | F04 | 75 | 15 |
| TFM Asset/Liability (ALBUM) | F05 | 75 | 15 |
| TFM ALBUM Plus - - Budget Synergizer | F09 | 75 | 15 |
| TFM Fixed Assets Accounting | F07 | 75 | 15 |
| TFM General Ledger | F01 | 75 | 15 |
| TFM Investment Portfolio Accounting | F03 | 75 | 15 |
| TFM Safe Deposit Box Accounting | F06 | 75 | 15 |
| TFM Shareholder | F08 | 75 | 15 |
| TFM Loan Loss Control | F10 | 75 | 15 |
| TFS-GL Fundamentals | G03 | 75 | 15 |
| TFS-GL Processing | G04 | 75 | 15 |
| TFS-GL Reporting | G05 | 75 | 15 |
| TFS-GL Sample Reports | G07 | 75 | 15 |
| TFS Primer | H01 | 50 | 10 |

| MANUAL | PRODUCT# | VOLUME COST | ANNUAL SUBSCRIPTION |
|---|---|---|---|
| TFS Reference | H03 | 75 | 15 |
| TFS Security Guide | H05 | 50 | 15 |
| TFS Report Writer - User Guide | H06 | 75 | 15 |
| TFS Report Writer - Reference | H07 | 75 | 15 |
| TFM Product Profitability (PPS) Set | G11/G12 | 150 | 30 |
| TFM Organizational Profitability (OPS) Set | G13/G14 | 150 | 30 |
| **Bank Operations** | | | |
| Total Integrated Protection (TIPS •) Set | T06/T08/T09 | 150 | 50 |
| LAN Administrator Reference | S05 | 75 | 15 |

## DEPOSITS ‡

| | |
|---|---|
| Interactive Exception Handling | 1,500.00 |
| Tax Compliance - Withholding | 100.00 |
| Combined Interest Checks | 500.00 |
| Account Analysis | 500.00 |
| Account Reconciliation Processing | 500.00 |
| Item Processing Interface BISYS Existing Format | |
|     Exception Item Pull | 500.00 |
|     Statement Rendering | 500.00 |
|     Daily Activity File | 500.00 |
| Item Processing Equipment Interface [1] | 5,000.00    Plus Time and Materials |
| Sweep Accounts | 500.00 |

## COMMERCIAL ‡

| | |
|---|---|
| Commercial Loans | 2,500.00 |

# INSTALLMENT AND SAVINGS ACCOUNT LOANS :

| | |
|---|---|
| Coupons | 500.00 |
| Credit Bureau Reporting | 100.00 |
| Dealer Reporting and Floor Planning | 100.00 |
| FASB #91 Processing | 500.00 |
| Installment and Savings Account Loans | 500.00 |
| Investor Reporting | 500.00 |
| Student Loans | 500.00 |

# MORTGAGE LOANS :

| | |
|---|---|
| Adjustable Mortgage Loans (AML) | 500.00 |
| Automatic Investor Transactions to GL/DDA Accounts | 250.00 |
| Bi-Weekly / Weekly Loan Processing | 500.00 |
| Tax/Insurance Check Writing System | 500.00 |
| Coupons | 500.00 |
| Credit Bureau Reporting | 100.00 |
| Escrow Analysis | 1,000.00 |
| FASB #91 Processing | 500.00 |
| Investor Reporting | 500.00 |

## OTHER ‡

| | |
|---|---|
| ACH Item Processing System (ACHIPS) | 2,000.00 |
| ReconPlus | 5,000.00 |
| Safe Deposit Box Accounting System | 2,000.00 |
| TargetPlus | 350.00 |
| Third Party GL Interface | 7,500.00   (MINIMUM) |
| Totalmatic | 500.00 |
| Toss | 750.00 |

## Terminal Interfaces ‡

IBM 4700
    Teller Software  1,500.00        Per Controller
    CRT Emulator                           500.00   Per Controller
    Teller Diskette Configuration      10.00   Per Controller
    BISYNC Communication          1,500.00   Per Controller

NCR 5000                                      12,000.00   License Fee

Other Terminal Interface Fee                        (Special Quote)

## Training Mode ‡

BISYS Test Bank Access (User 9900)          500.00

Complete Test Bank 1,000.00

# CONVERSION / DECONVERSION SERVICES ‡

**Conversion of Standard Applications**

Three months' charges for new/acquired services provided under Standard Services Price List (plus Travel and Lodging expenses).  (MINIMUM $5,000.)

Conversion charges will be invoiced one-third (1/3) at contract signing/notification, one-third (1/3) at completion of test conversion, and one-third (1/3) at completion of live conversion.

Additional consultation support for file requirements will be billed in accordance with BISYS' published price schedule then in effect.

**Deconversion of Standard Applications**

One-hundred percent (100%) of Average of last twelve (12) months charges exclusive of Discounts for services provided under Standard Services Price List.  (MINIMUM of Twenty Thousand Dollars [$20,000.00]).

Deconversion package includes:

- One (1) set of Test files of Client's files in standard BISYS format.
- Two (2) sets of Live files in standard BISYS format
- One (1) full Trial Balance for each Application at Test and Live.
- One (1) set of Technical record layouts per Application
- Ten (10) hours of telephone consultation support on BISYS system/file formats

Payment shall be made via wire transfer to BISYS.  All past due amounts and related termination charges per the terms of the Services Agreement must be brought current prior to production of final set of files.

Additional consultation support for file requirements will be billed in accordance with BISYS' published price schedule then in effect.

Additional file adjustments, option changes, and special requests will be billed in accordance with BISYS' published price schedule then in effect.

ADDENDUM TO SERVICES AGREEMENT NO. CPC - 2779

SERVICES AGREEMENT DATED AS OF _____

Reference is made to the above Services Agreement between the undersigned (the "Agreement") to which this Addendum is attached and made a part thereof.

The Agreement is hereby amended and supplemented as follows:

1.    Except as expressly amended and supplemented hereby, all terms defined in the Agreement shall have the same meanings when used herein.

2.    <u>Charges</u>.

2.1    For purposes of the Agreement and this Addendum, "<u>Exhibit A Services</u>" shall mean the Services identified on attached <u>Exhibit A</u> (both the Standard Services and Special Services listed on <u>Exhibit A</u>). The parties agree that included in the definition of <u>Exhibit A Services</u> are Client usage of any features associated with the Services listed on the Standard Services portion of <u>Exhibit A</u> which features are in existence and available to Client as of the date of this Addendum. Neither features, nor Services, listed on the Price Lists as of the date hereof, but not set forth on <u>Exhibit A</u> shall be deemed to be part of the <u>Exhibit A Services</u> and such other Services and/or features shall be billed to Client in accordance with the provisions of Paragraph 2.3 below. The parties also agree that <u>Exhibit A Services</u> are recurring Services and do not include any installation charges, training charges, one-time license fees or any other one-time charges.

2.2    During the Initial Period, Client shall be entitled to a fifty percent (50%) discount on the charges, as in effect from time to time, for the <u>Exhibit A Services</u>.

2.3    In addition to charges for Exhibit A Services, Client will pay BISYS each month for:

(a)    All usage of Services not set forth on <u>Exhibit A</u>; and

(b)    All pass-through charges, including but not limited to telecommunication charges, courier charges and reasonable postage charges (which shall not include postage charges for customer service correspondence).

(c)    The one-time fees for the Services as set forth on <u>Exhibit B</u> hereto, 50% payable upon execution of an Additional Services Agreement relating to any such Services and the remaining 50% payable in the month following installation of any such Services.

(d)    The usage of any Services as set forth on <u>Exhibit C</u> (optional services), subject to the execution of an Additional Services Agreement relating to such Service.

2.4    During the first twelve (12) months of the Initial Period, BISYS agrees that the charges for the Services will not be increased. Thereafter, BISYS agrees that any increase in the charges for any Services will be limited in the aggregate to the lesser of (i) five percent (5%) per year, or (ii) the percentage increase in the United States Consumer Price Index as published by the Bureau of Labor Statistics, United State Department of Labor



EXHIBIT
" C "

("CPI"), during the twelve month period immediately preceding the date of each such increase.

2.5     **Additional Credits.**

(a)     During the Initial Period, BISYS agrees to grant Client a credit in the aggregate amount of $20,000.00. Client may apply this credit at its discretion against the charges for the Services set forth on the Monthly Invoice or against one-time implementation charges reflected on Exhibit B. In either case, the credit cannot be applied against hardware, or actual out-of-pocket expenses.

(b)     In addition, during the first thirty-two months of the Initial Period, BISYS agrees to grant Client a non-cumulative monthly credit in the amount of $312.50. Client may apply this credit at its discretion against the charges for the Services set forth on the Monthly Invoice or against one-time implementation charges for Services purchased by Client after the Conversion Date. In either case, the credits cannot be applied against hardware, or actual out-of-pocket expenses.

3.     **FDIC Approval.** BISYS acknowledges that this Agreement is subject to the approval of Client's applications to the Federal Deposit Insurance Corporation and the OTS, which are anticipated by Client no later than August 31, 1999. However, in order to induce BISYS to commence work related to converting Client to the BISYS System, Client has executed this Agreement prior to receipt of such approvals. Upon receipt of notice by Client that it has not received either such approval, Client shall immediately provide BISYS written notice that the approval has not been received. Upon receipt of such notice from Client, this Agreement shall be deemed terminated and BISYS shall discontinue any work relating to the conversion of Client to the BISYS System. Client shall pay BISYS for all work performed by BISYS associated with the conversion of Client to the BISYS System through the date of termination of this Agreement.

4.     **Year 2000.** At no additional charge to Client, BISYS agrees to perform comprehensive tests on the BISYS System to simulate the actual turning of the century. These tests shall be intended to identify any operational issues caused by the occurrence of the date September 9, 1999 and the century change at midnight December 31, 1999. BISYS agrees to release by March 31, 1999 all necessary updates and changes for the BISYS System, if any, to accommodate the turn of the century. BISYS agrees to distribute any such change or updates to the BISYS System when they are generally made available to its clients. Such distribution may be in the form of new releases, updates or other similar methods of distributing software bug fixes as BISYS may see fit. All modifications, updates or changes made by BISYS shall be to the BISYS System, BISYS provided third party software products and interfaces only, and not to any third party provided software. BISYS agrees to assist Client in Year 2000 testing on its data files, if requested; provided that such testing must be completed no later than September 30, 1999. In the event that, in Client's reasonable opinion, the BISYS System is not Year 2000 ready and will not be Year 2000 ready by Conversion Date, Client's sole remedy and BISYS' sole liability shall be for Client to terminate this Agreement, provided that:

(i)     Client shall provide notice of such termination to BISYS no later than April 30, 1999, such notice to include a specific description of the deficiencies in the BISYS System that are the grounds for such termination; and

(ii)     BISYS shall have failed to cure such deficiencies within forty-five (45) days of receipt of such notice; and

(iii)    Client shall pay BISYS for all Services provided to Client, including pass-through charges, through the effective termination date; and

(iv)    Client shall pay BISYS for all Deconversion assistance in accordance with Paragraph 9(B) of the Agreement; and

(v)     All payments must be made prior to the delivery of Client Files.

5.    Dispute Resolution.

5.1    Notwithstanding anything to the contrary contained in the Agreement, the substantially prevailing party shall be entitled to recover its litigation/collection costs and reasonable attorneys' fees. In no event shall any failure to remit amounts due to BISYS that are disputed by Client in good faith be deemed a breach of the Agreement that gives rise to BISYS' right to terminate the Agreement.

5.2    Disputes hereunder shall be subject to the jurisdiction of the state and federal courts located in the Northern District of the State of Illinois.

6.    Governmental Agencies.

6.1    Paragraph 11(B) of the Agreement is hereby amended by adding the following at the conclusion of the Paragraph: "In the event that any Third Party Review Report contains a "qualified" opinion by the reviewing party, Client shall have the right to terminate this Agreement by providing notice to BISYS of its intention to terminate, provided that BISYS shall have ninety (90) days to cure all material deficiencies noted in such "qualified" opinion. Clauses (iii) through (v) of Paragraph 4 of this Addendum shall apply to any termination under this Paragraph."

6.2    Paragraph 11(C) of the Agreement is hereby amended by adding the following prior to the last sentence of such Paragraph: "In the event that BISYS elects not to perform any such modifications and such failure materially impacts Client's operations, Client shall have the right to terminate this Agreement by providing notice to BISYS of its intention to terminate, provided that BISYS shall have ninety (90) days to cure such failure. Clauses (iii) through (v) of Paragraph 4 of this Addendum shall apply to any termination under this Paragraph."

7.    With respect to any travel and lodging expenses of BISYS employees reimbursable by Client, BISYS agrees that its personnel will only fly coach or business class, and the "per diem" charge will be limited to 120% of the then applicable Federal government per diem for the Chicago area (currently $199 per day per person).

8.    BISYS acknowledges that the Client is "in formation" an that the person executing the Agreement and this Addendum is doing so on behalf of Client. No personal liability shall accrue to such signatory by virtue of his execution of the Agreement and this Addendum on behalf of Client.

9.    Neither BISYS nor Client shall (except to persons acting on behalf of such party) disclose, and neither party shall permit any of its employees or other persons who act or acted in its behalf to disclose, any of the terms and conditions of the Agreement, including without limitation any Addendum or pricing terms, except as may be required by law.

Except as expressly amended and supplemented hereby, the Agreement shall remain unchanged and continue to be in full force and effect.

This Addendum supersedes and replaces any prior agreement (written or oral) as to its subject matter. If there is any conflict between the terms and conditions of this Addendum and the terms and conditions of the Agreement or any prior addendum to this Agreement, the Terms and Conditions of this Addendum shall prevail.

**BISYS, INC.**                                      **ALLIANCE FSB**

By: _____               By: _____

Name: _W. W. Neville_                       Name: _Lawrence H. Chlum_
_____President_____

Title: _____            Title: _President_

Date: _____3/18/99_____                  Date: _____3/16/99_____

THIS ADDENDUM SHALL BECOME EFFECTIVE UPON BEING SIGNED BY AN AUTHORIZED OFFICER OF BISYS. BISYS' MARKETING REPRESENTATIVES DO NOT HAVE THE AUTHORITY TO BIND BISYS.

Contract No. **CHG - 2779**

**ALLIANCE FSB**
**EXHIBIT "A" SERVICES**

**Transaction Account Processing (DDA, MMDA, NOW, Commercial DDA, SUPER NOW)**
    Account Base
    Account Analysis
    Check Register on Statement
    DDA Statement Production (includes interim statements)
    Item Processing Interface
    Line-of-Credit Processing
    Transaction Base
    Variable Interest Rate Processing
    On-Line History

**Savings, Time Deposits/Certificates of Deposits**
    Account Base
    Interest Checks
    On-Line History
    Retirement Accounts
    Statement Production (statement pages printed at BISYS NOT included)
    Variable Interest Rate Processing

**All Deposits**
    Combined Statements
    Production of Activity Reports
    EFT Notices
    Over Draft Reminder Notices
    Currency Reporting
    Account Consolidation Report
    Anniversary Processing
    Audit Confirmations (once per year)
    Bank Check Reconciliation Tape
    CD Renewal Confirmation
    Proxy Reporting
    Realty Trust/Surrogate Processing
    Retirement Account Statements
    Savings Service Charges
    Tenant Rent Security Processing
    Tax Compliance - Withholding
    W9Bs (mailing label and mailer NOT included)
    Account Reconciliation Processing
    Item Processing Interface
    NSF/UCF Qualification Report
    Sweep Accounts
    1099, 1099R, 5498 Production (forms charge and rendering charge NOT included)
    Interactive Exception Handling
    OTS/FDIC Reports



File Maintenance History
Transaction Processing Notices

**Commercial Loans**
Account Base

**Installment Loans**
Account Base
Adjustable Installment Loans
Commercial Loan Processing
Coupon Loans MICR/OCR
Customer Notices and Billings
Dealer Reporting and Floor Planning
Investor Reporting
Lock Box - Stop Tape Production
On-Line History (18 months)
Student Loan Processing
Annual IL Notice, Statement
Automatic Student Loan Check Printing
Classification Report
Credit Bureau Reporting (up to 2)
FASB #91 Processing
Loan 10K Report
Overdraft/LOC Loan Notice
Savings Account Loan Trial Balance
Simple Interest Loan Analysis

**Mortgage Loans**
Account Base
Tax and Insurance System
Coupon Loans MICR/OCR
Escrow Analysis
Adjustable Loans
Bill and Receipt Processing
Bi-Weekly/Weekly Loans
Collection Loans
Investor Reporting
Lock Box Stop Tape Production
On-Line History (18 months)
Report to Credit Bureaus
AML Reminder Notice Worksheet
Annual Mortgage Borrower Statements
Credit Bureau Reporting - Monthly (up to 2 bureaus)
FASB #91 Processing
FHLMC Form 11 on Magnetic Tape
FHLMC Submission Schedule
Interest on Escrow System
Investor Reporting Tape Production
LASERNET Remittance Tape

Loan Solicitation Tape Production
Loan Solicitations of Printed Forms
Loan 10K Report
ML Available for Sale Report
Tax Bill Processing Tape Production

**Construction Loans**
Account Base
Notices
On-Line History (18 months)

**All Loans**
1098, 1099A, 1099s for OTC Records (forms and rendering NOT included)
1098 Production (forms and rendering NOT included)
Letter Writing
Letter Writing Down Load
File Maintenance History
Multi-Borrower Report

**General Ledger**
Total Financial Manager Windows LAN Version
Accounts Payable (Windows)
Fixed Assets (Windows)
Investment Tracking (DOS)
Per Transaction Fee

**Automatic Transaction Generation and Posting**
From or To ACH
System Generated Transactions
Totalmatic

**Central Information File (CIF)**
Account Base
Memo System
**TargetPlus**
TargetPlus System
16 Reports per Month*

*Any Client usage of TargetPlus in excess of this number will be charged to Client at the charges set forth in the Price Lists.

Contract No. **CRG - 2779**

**ALLIANCE FSB
EXHIBIT B**

<u>**Service**</u>

<u>**One-Time Installation Charge[1]**</u>

| Service | One-Time Installation Charge |
|---|---|
| Conversion Services (includes : TOSS, ACHIPS) | $ 5,962.00  6/30 |
| Total Financial Manager LAN Version Package | $23,750.00  6/30 |
| ATM On-line Service | $ 5,000.00  6/30 |
| Debit Card Processing | $ 2,400.00[2]  Not obtained |
| BISYS Encore Branch Automation Software License (includes maximum 5 Teller Stations, 3 Platform Stations and 3 Inquiry & Maintenance Back-Office Copies) | $32,200.00  6/30 |
| TIMS/QM Report Retrieval System | $30,850.00  (NW $22,000 + 22000) |
| TOSS | $    500.00 |
| ACH Return Item Processing | $ 2,000.00 |
| Total Access Banking Voice Response | $32,500.00[2]  Not obtained |
| Data Communication Estimate | $ 6,268.00 |

(1) These one-time installation charges do not include out-of-pocket travel and lodging expenses or other pass-through charges incurred by BISYS associated with the installation of the Services.

(2) The one-time fees for Debit Card Processing and Voice Response will not change for a period of eighteen (18) months following Conversion Date. After that, the one-time fees will be at then current pricing as set forth on the Special Services Price List.

Contract No._____  CHG - 2779

**ALLIANCE FSB**
**EXHIBIT C**

**Estimated**
**Monthly Fees**

**Special & Optional Services**

| | |
|---|---|
| ATM On-line Services | $    689.00 |
| Debit Card Processing | $    447.00 |
| TIMS/QM Report Management System | $    365.00 |
| BISYS Encore Branch Automation (includes 5 Teller, 3 Platform/CFI forms, and 3 Back-office devices) | $    818.00 |
| Terminal Connection Services (11 Terminals) | $    450.00 |
| Disaster Recovery Assessment | $     79.00 |
| ACH Return Item Processing | $    103.00 |
| Total Access Banking Voice Response | $ 1,583.00 |
| Data Communication Estimate | $ 1,066.00 |

**Note:**  Charges listed on this Exhibit C are estimates based on current activity and volume.  In the event Client elects to purchase any of the Services listed above, actual pricing will be determined pursuant to an Additional Services Agreement to be entered into by BISYS and the Client. Pricing for the Services set forth on this Exhibit C shall be subject to the provisions of Paragraph 2.4 of this Addendum.

## AMENDMENT TO SERVICES AGREEMENT NO. 2779

## SERVICES AGREEMENT DATED AS OF 3/18/99

Reference is made to the above Services Agreement between the BISYS, Inc., now known as BISYS Information Solutions L.P. ("BISYS") and Alliance FSB ("Client") (the "Agreement"), including the Addendum to said Agreement that the parties entered into concurrently with the Agreement (the "Addendum"), and any addendums thereto commonly referred to as either an "Additional Services Agreement" or "Additional Services Addendum" (individually, an "ASA"). This Extension Amendment (the "Amendment") is made a part of the Agreement.

WHEREAS, Client is acquiring Preferred Savings Bank/Chicago ("Preferred Savings") (the "Acquisition"), and upon completion of the Acquisition, the accounts of Preferred Savings will be converted onto the BISYS System as part of Client's Client Files; and

WHEREAS, as a result of the Acquisition, Client and BISYS have negotiated the redefinition of the Initial Period of the Agreement, as well as additional provisions and other revisions to the Agreement;

NOW, THEREFORE, in consideration of the mutual agreements set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree that the Agreement is hereby amended and supplemented as follows:

The Agreement is hereby amended and supplemented as follows:

1.  Except as expressly amended and supplemented hereby, all terms defined in the Agreement shall have the same meanings when used herein.

2.  <u>Term of Agreement</u>

    Section 2(A) of the Agreement is hereby amended so that the Initial Term of the Agreement will extend for sixty (60) full calendar months beginning upon the first full calendar month following the completion of the conversion and merger of the Preferred Savings accounts onto the BISYS System as Client's Client Files.

3.  <u>Charges.</u>

    Upon the completion of the conversion and merger of the Preferred Savings accounts onto the BISYS System as Client Files, BISYS will provide Client with a fixed, monthly credit of $3,312.50, to be applied against the monthly invoices for the new Initial Period. The $312.50 monthly credit previously granted by BISYS in Section 2.5(b) of the Addendum shall be discontinued upon the completion of the conversion and merger of the Preferred Savings accounts onto the BISYS System as Client Files.

4.  <u>Additional Services.</u>  Client agrees that it will purchase such new Services and products as set forth herein. Client will pay the one-time costs associated with the implementation of those Services and products, as noted in the respective ASAs.

    A.  Client agrees to replace the Encore Tellering and Platform products with the TotalPlatform & TotalTranz offerings.

    B.  Client agrees to implement the Total Access Banking-ASP product



EXHIBIT
"D"

C.    Client agrees to implement Debit Card processing.

Except as expressly amended and supplemented hereby, the Agreement including the Addendum, shall remain unchanged and continue to be in full force and effect. This Amendment supersedes and replaces any prior agreement (written or oral) as to its subject matter. If there is any conflict between the terms and conditions of this Amendment and the terms and conditions of the Agreement and/or Addendum, the Terms and Conditions of this Amendment shall prevail.

BISYS Information Solutions L.P.

By: _____

Name: James I. Guidici

Title: Exec. V.P.

Date: 12/11/01

Alliance FSB

By: _____

Name: Lawrence H. Chlum

Title: President

Date: December 5, 2001

THIS AMENDMENT SHALL BECOME EFFECTIVE UPON BEING SIGNED BY AN AUTHORIZED OFFICER OF BISYS. BISYS' MARKETING REPRESENTATIVES DO NOT HAVE THE AUTHORITY TO BIND BISYS.

## SECOND AMENDMENT TO SERVICES AGREEMENT #2779

This Second Amendment to Services Agreement #2779 (this "Second Amendment") is effective this 12th day of April, 2007 (the "Amendment Date"), by and between Open Solutions Inc. ("OSI"), a Delaware corporation having its principal place of business at 455 Winding Brook Drive, Glastonbury, Connecticut 06033, and Alliance FSB ("Client"), a Federally chartered Bank having its principal offices at 7840 North Milwaukee Avenue, Niles, Illinois 60714.

### WITNESSETH:

WHEREAS, OSI, as successor-in-interest to BISYS, Inc., and Client are parties to that certain Services Agreement #2779 effective as of March 18, 1999 (the "Agreement"), as amended by that certain Addendum to Services Agreement #2779 executed simultaneously with the Agreement (the "First Amendment"); and

WHEREAS, OSI and Client each desires to amend said Agreement as provided herein;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,

IT IS HEREBY AGREED as follows:

1.      Notwithstanding any previously provided notices of termination provided by Client to OSI, the Agreement is hereby extended for an additional twelve (12) months after the expiration of the first renewal period on September 30, 2007 and shall continue until September 30, 2008 (the "Second Renewal Term"). The Agreement shall thereafter renew in accordance with Paragraph 2(B) of the Agreement.

2.      All notices, reports, approvals or consents required or permitted under the Agreement between the parties shall be in writing and shall be deemed to have been given if personally delivered or sent by certified or registered mail (return receipt) or telecopy to the addresses set forth below, or such other address as is provided by notice as set forth herein. Notices shall be deemed effective upon receipt or, if delivery is not effected by reason of some fault of the addressee, when tendered.

| If to OSI: | If to Client: |
|---|---|
| Open Solutions Inc.<br>455 Winding Brook Drive<br>Glastonbury, CT 06033<br>Facsimile: (860) 652-3156<br>Attn: Chief Financial Officer | Alliance FSB<br>7840 North Milwaukee Avenue<br>Niles, IL 60714<br>Facsimile:<br>Attn: |

3.      This Second Amendment may be executed in separate counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. Any signature delivered by a party by facsimile transmission or electronic delivery shall be deemed to be an original signature hereto. In pleading or proving this Second Amendment, it will not be necessary to produce or account for more than one such counterpart.

4.      Except as otherwise set forth herein, all terms and provisions contained in the Agreement shall remain in full force and effect.



EXHIBIT
" E "

5.     The Agreement, as hereby amended, shall be binding upon the parties hereto, their permitted successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Second Amendment effective as of Amendment Date.

**ALLIANCE FSB**

By _Lawrence N Chlum_

Name    **Lawrence H. Chlum**

Title    **President**

Date:    **April 12, 2007**

**OPEN SOLUTIONS INC.**

By _K. J. L_

Name

Title    **Kenneth J. Saunders**
         **E.V.P. and C.F.O.**

Date:    _6-1-07_

Reviewed as to Legal Form
OSI Law Dept   Initial _CAU_



4800 S. Pulaski Rd.
Chicago, Illinois 60632
Phone: 773.376.3800   Fax: 773.376.8222   www.pnabank.net

March 4, 2008

Open Solutions, Inc.
455 Winding Brook Drive
Glastonbury, CT 06033
Attn:   Chief Financial Officer

**Via Fax & Mail**
**Fax No. (860) 652-3156**

Re:    Notice of Contract Termination
       Service Agreement #2779

Dear Sir or Madam:

Open Solutions, Inc. currently provides data processing services to PNA Bank pursuant to a Services Agreement dated March 18, 1999, which was subsequently amended December 11, 2001 and April 12, 2007 (hereinafter the "Agreement").

PNA Bank hereby notifies Open Solutions, Inc. that PNA Bank will not renew the Agreement upon the completion of the term of the Agreement on September 30, 2008.

Please contact me if you have any questions or comments regarding this matter.

Very truly yours,

*Lawrence H Chlum*

Lawrence H. Chlum
President

LHC

Copy to:    Mr. Paul Stuart
            Senior Account Executive
            Open Solutions Inc.
            7052 Nathan Lane
            Carpentersville, IL 60110

EXHIBIT
" F "

# STONE
# POGRUND
# & KOREY LLC

*Attorneys at Law      Established 1957*

1 EAST WACKER DRIVE, SUITE 2610
CHICAGO, ILLINOIS 60601
PHONE: 312-782-3636 FAX 312-782-1482
www.spklaw.com

WRITER'S E-MAIL ADDRESS:
pjoy@spklaw.com

BERTRAM A. STONE (1915-1994)
SHERWIN L. POGRUND, P.C.
MARTIN S. KOREY
JAMES P. ZIEGLER
DAVID R. PORTLAND
CHRISTOPHER T. NOVOTARSKI, P.C.
LAWRENCE J. STARK *
DEAN J. LURIE
STUART M. SHELDON
PATRICK T. JOY
* Also admitted in Florida

July 16, 2008

**VIA CERTIFIED MAIL (RETURN RECEIPT)**
**& TELECOPY TO 860-652-3156 (1 page)**
Open Solutions, Inc.
455 Winding Brook Drive
Glastonbury, CT 06033
ATTN: Chief Financial Officer

RE:    **Services Agreement #2779 Between Open Solutions Inc., and PNA Bank,**
**f/k/a Alliance FSB.**

To Whom It May Concern:

This office represents PNA Bank f/k/a Alliance FSB ("PNA Bank") in this matter. Open
Solutions, Inc. currently provides data processing services to PNA Bank pursuant to a Services
Agreement dated March 18, 1999, which was subsequently amended December 11, 2001 and
April 12, 2007 (hereinafter the "Agreement"). Pursuant to paragraph 2(C) of the Services
Agreement, PNA Bank notifies Open Solutions, Inc., that the termination date is hereby
extended to November 17, 2008. Be advised that this office is authorized to act on behalf of PNA
Bank in this regard, as acknowledged and approved below by Lawrence Chlum, president of
PNA Bank.

Please contact us if you have any questions or comments regarding this matter.

Very truly yours,
**STONE POGRUND & KOREY LLC**

Patrick T. Joy

**ACKNOWLEDGED AND APPROVED**
PNA Bank, f/k/a Alliance FSB

By: Lawrence Chlum, its President

EXHIBIT
G

**SERVICES AGREEMENT**

BISYS, INC.
11 Greenway Plaza
Houston, Texas 77046-1102

Contract No. **CHG - 2779**
Price List No. ___07-96___

Client   ___Alliance FSB___

Address   ___7840 North Milwaukee Avenue___

City   ___Niles___          State   ___Illinois___          Zip Code   ___60714___

## 1. SCOPE OF AGREEMENT

Client agrees to convert to the BISYS system (defined in Paragraph 2(C) below) and BISYS, Inc. ("BISYS") shall provide Client, in accordance with this Agreement, the services selected by Client from BISYS' then applicable Standard Services Price List and/or Special Services Price List (collectively, the "Price Lists"). BISYS shall provide the reports listed on the Standard Reports List and Special Reports List as applicable to the Services selected by Client. The current Price Lists are attached hereto and made a part hereof.

## 2. TERM OF AGREEMENT

A. The initial term of this Agreement shall commence the date this Agreement is executed by both parties and end 60 full calendar months after the "Conversion Date" (as defined in Paragraph 4 (B)) (the "Initial Period").

B. The Agreement shall automatically continue after the Initial Period for subsequent consecutive terms of three years each unless and until it is terminated by either party upon written notice to the other given at least 180 days prior to the end of the Initial Period or any additional three year period.

C. If Client has given BISYS notice pursuant to Paragraph 2(B) and Client intends to deconvert from the BISYS data processing system ("BISYS System"), Client may, upon written notice to BISYS given at any time during the final 120 days of this Agreement (as determined in accordance with 2(B) above) or any extension hereof pursuant to this Paragraph 2(C), extend the termination date to the date indicated in such notice, which date shall not be, in any event, less than 120 days after the date of such notice. Commencing at the end of the Initial Period or any renewal period (as applicable), Client shall pay for Services at the prices set forth in the then current BISYS Price Lists notwithstanding the giving of extension notice.

D. Continuing obligations under this Agreement are those relating to "BISYS Products" (defined in Paragraph 10(A)), "Confidential Information" (defined in Paragraph 10(F)) and "Client Files" (defined in Paragraph 8(A)), and such continuing obligations shall survive any termination of this Agreement.

## 3. CHARGES

A. Each month commencing Conversion Date, whether or not Client actually uses any Services during such month, Client shall pay a minimum monthly charge equal to the greater of (i) $2,500.00; (ii) BISYS' charges for the Services actually used by Client during such month; (iii) 80% of the charges invoiced to Client during the immediately preceding month; or (iv) 80% of the charges invoiced to Client for the month immediately preceding any deconversion by Client if Client deconverts from the BISYS System.

B. The initial charges for the Services are specified in the Price Lists, and shall be recorded by the BISYS System or by any other means used by BISYS of determining Client's usage. The charges for the Services listed on the Standard Services Price List as of the date hereof will not be changed by BISYS until the expiration of the first year following Conversion Date. Thereafter, during the remaining term of the Initial Period, the charges for the Services listed on the Standard Services Price List may be changed by BISYS at any time and from time to time upon at least 90 days prior written notice to Client. During the Initial Period, the charges for the Services listed on the Special Services Price List as of the date hereof may be changed by BISYS at any time after the date hereof upon at least 90 days prior written notice to Client. After the Initial Period, the charges for the Services listed on the Price Lists shall automatically, and without notice, be changed to BISYS' standard (non-discounted) list prices then in effect for the respective Services; such prices may, thereafter, be changed by BISYS, at any time and from time to time, upon at least 90 days prior written notice to Client.

C. These shall be added to all charges for the Services furnished Client hereunder amounts equal to any applicable taxes levied or based on such Services, exclusive of taxes based on BISYS' income.

D. No later than the 5th day of each calendar month, BISYS shall invoice (the "Monthly Invoice") Client: (i) for all Services projected to be used by Client during that billing month (the "Billing Month") which charge will be based upon either actual usage and number of accounts during the month prior to the Billing Month or the minimum charge pursuant to Paragraph 3(A); (ii) an amount equal to 100% of the recurring pass through charges actually utilized by Client during the prior month as the estimated pass through charges for the Billing Month; (iii) adjustments (debits/credits) to the prior month's estimated charges set forth in (i) and (ii) above and; (iv) all other charges incurred by Client during the prior month. For the projected portion of the invoice, the first Monthly Invoice shall be based upon BISYS' estimates of usage and shall also include for the prior month (during which the Conversion Date occurred) a full month's Monthly Invoice unless the Conversion Date is after the 15th of the prior month, in which event Client shall be assessed one-half month's charges for the prior month. Client agrees to pay all amounts set forth in the Monthly Invoice by automatic debit by BISYS on the last business day of the Billing Month from a Client bank account established for this purpose (the "Payment Account"). Client agrees to execute any and all required documentation to enable BISYS to perform such automatic debiting of the Payment Account. If Client fails to pay any amounts due under this Agreement, Client shall, upon demand, pay interest at the rate of 1-1/2% per month, but in no event more than the highest interest rate allowable, on such delinquent amounts from their due date until the date of payment. Client agrees to reimburse BISYS for any and all expenses BISYS may incur, including reasonable attorney fees, in taking action to collect any amounts due BISYS hereunder. All amounts due must be paid prior to Client's deconversion from the BISYS System.

## 4. CONVERSION TO THE SERVICES

A. BISYS shall, to the extent applicable, convert machine readable Client Files to make them compatible with the Services selected by Client from the Standard Services Price List. Client agrees to cooperate with BISYS and provide all necessary information and assistance required for BISYS to successfully convert such Client Files. Client will assign a liaison person to assist and cooperate with BISYS in such conversion.

B. BISYS shall determine in accordance with its normal acceptance procedures when the applicable Client Files have been successfully converted and when the Services selected by Client from the Standard Services Price List are operational and available for Client's use. The date the first of the Services selected by Client from the Standard Services Price List is operational and available for Client's use is the "Conversion Date".



EXHIBIT
"2"

**5. AVAILABILITY OF THE SERVICES**

A. Hours for accessing Services on an on-line basis ("On-Line Hours") at the BISYS data center providing Services to Client ("Data Center") are 7:00 A.M. to 9:00 P.M. Monday through Friday and 7:00 A.M. to 6:00 P.M. Saturday (Data Center time) exclusive of BISYS holidays (New Years Day, Labor Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day). A particular Service may also be available at other than On-Line Hours, in which event Client may, at its option and subject to any additional charges therefor, use that Service at such other times.

B. BISYS will make every reasonable effort to have the Services available during the On-Line Hours. However, BISYS cannot and does not guarantee such availability. Accordingly, Client's remedy and BISYS' sole liability to Client or any third party for claims, notwithstanding the form of such claims (e.g., contract, negligence or otherwise), arising out of (i) the unavailability of the BISYS System or (ii) the interruption in or delay of the Services provided or to be provided by BISYS hereunder, shall be for BISYS to use all reasonable efforts to make the BISYS System available and/or to resume the Services as promptly as reasonably practicable.

C. Client shall, at it's expense, be responsible for delivering and transmitting to and from Client's offices, the offices of the applicable regulatory authorities and any other location authorized by Client, and the Data Center all data and information necessary for BISYS to furnish the Services to Client.

**6. USE OF THE SERVICES**

A. Client is exclusively responsible for the consequences of its own actions; for any instructions it gives BISYS; for its failure to access the Services in the manner prescribed by BISYS, and for its failure to supply accurate input information. Client is responsible for auditing, balancing, verifying the correctness of calculation routines (such as interest and service charges) and reconciling any out-of-balance condition, and for notifying BISYS of any errors in the foregoing within three business days after receipt of the incorrect information. Client's remedy and BISYS' sole liability to Client or any third party for any claims, notwithstanding the form of such claims (e.g., contract, negligence or otherwise), arising out of errors or omissions in the Services provided or to be provided by BISYS hereunder and caused by BISYS shall be for BISYS to furnish the correct report and/or to correct the applicable Client Files, provided that Client promptly advises BISYS thereof.

B. Client shall use the Services in accordance with such reasonable instructions as may be established by BISYS from time to time as set forth in any written materials furnished by BISYS to Client.

C. Except as otherwise permitted by BISYS, Client will use the Services only for its own internal and proper business purposes and will not sell or otherwise provide, directly or indirectly, any of the Services or any portion thereof to any third party.

D. Client shall not make any alteration, change or modification to any of the computer programs, data bases and/or BISYS supported files used by BISYS in connection with providing the Services to Client hereunder, without BISYS' prior written consent in each instance.

E. BISYS shall give Client 30 days written notice of any BISYS system change which materially affects Client. Nothing herein shall preclude or limit BISYS' ability to make changes to its data processing system.

**7. COMMUNICATION LINES AND EQUIPMENT.**

A. BISYS shall order, on Client's behalf and with Client's approval, the installation of appropriate telephone lines and communications equipment to enable Client to access the Services. Client shall pay all charges relating to the installation and use of such telephone lines and communications equipment.

B. BISYS shall not be responsible for the reliability, or continued availability, of telephone lines and communications equipment used by Client in accessing the Services.

**8. FILE SECURITY AND RETENTION.**

A. Any Client data bases and files or other information provided by Client to BISYS for use with the Services (the "Client Files") shall remain the confidential property of Client. BISYS will provide reasonable security provisions to insure that third parties do not have access to the Client Files. BISYS reserves the right to issue and change regulations and procedures from time to time to improve file security. BISYS will instruct its employees having access to the Client files to keep the same confidential by using the same care and discretion that BISYS uses with respect to its own confidential property.

B. BISYS will take reasonable precautions to prevent the loss of, or alteration to, Client Files, but BISYS cannot guarantee against any such loss or alteration. Accordingly, Client will, to the extent deemed necessary by Client, keep copies of all source documents of information delivered to BISYS and will maintain a procedure external to the BISYS System for the reconstruction of lost or altered Client Files. In connection with the foregoing, it is understood that Client shall assume and be responsible for risk of loss and/or damage to documents and records while they are in transit to and from the Data Center.

C. During the term of this Agreement, BISYS will retain the Client Files in accordance with, and to the extent provided by BISYS' then prevailing records retention policies for the Services, which policies will be consistent with guidelines covering the Services established by appropriate regulatory authorities. BISYS will, upon the expiration of any retention period for Client Files, dispose of Client Files in any manner deemed appropriate by BISYS unless Client, prior to such disposal, furnishes to BISYS written instructions for the disposition of such Client Files at Client's expense. Client shall pay for the provision of Client Files to Client at BISYS' standard rates for such services and BISYS shall provide such Client Files provided that BISYS has been paid for all Services provided hereunder through the date such requested Client Files are returned to Client.

D. BISYS has a written Disaster Recovery Plan establishing emergency procedures, including off-premises backup facility. In connection therewith, BISYS has prepared a Disaster Recovery Manual. The Disaster Recovery Plan and Disaster Recovery Manual are available at the Data Center for examination by bank auditors and examiners and, as they may be modified from time to time, will remain in existence during the term of this Agreement. BISYS shall provide Client, upon written request, with information necessary for Client to develop a disaster contingency plan which will work in concert with BISYS' Disaster Recovery Plan.

**9. DUTIES UPON TERMINATION; RETURN OF RECORDS.**

A. Upon the termination of this Agreement for any reason, BISYS will dispose of all Client Files still in the BISYS System in any manner deemed appropriate by BISYS unless Client, not later than 30 days after such termination, furnishes to BISYS written instructions for the disposition of such Client Files at Client's expense as set forth in Paragraph 9(B).

B. At Client's request as set forth in Paragraph 9(A), BISYS shall deliver to Client all of the Client Files then retained by BISYS including file layouts and their descriptions in BISYS format and shall provide in accordance with BISYS deconversion policies, reasonable and necessary assistance with the deconversion from the BISYS System to a non-BISYS system ("Deconversion"). Client shall pay BISYS for Deconversion assistance in accordance with BISYS' then current Deconversion rate schedule. Payment for Deconversion together with all other payments which are due, and which will become due pursuant to the provisions of this Agreement shall be paid to BISYS prior to delivery of such Client Files.

C. Client Files returned to Client shall be in a standard BISYS machine readable format.

**10. OWNERSHIP, USE AND CONFIDENTIALITY; BISYS PRODUCTS AND CONFIDENTIAL INFORMATION.**

A. All computer programs and related documentation made available, directly or indirectly, by BISYS to Client as part of the Services (the "BISYS Products") are the exclusive and confidential property of BISYS or the third parties from whom BISYS has secured the right to use such computer programs and documentation.

B. A personal, non-exclusive, non-transferable right and license is being granted to Client to use, during the term of this Agreement, any applications software programs included in the BISYS Products (the "Application Programs") which are delivered to Client as part of the Services solely for Client's own business usage. Client shall not have any interest in the Applications Programs except for data internal license.

C. Client shall receive all improvements, enhancements, modifications and updates to any Applications Programs which are delivered to Client as part of the Services if, and to, made available by BISYS to its clients generally. All such improvements, enhancements, modifications and updates shall be delivered to Client in the form of a computer media, which media shall be provided to Client by BISYS and shall be installed by Client. If Client fails to install any such media within 45 days of its receipt from BISYS, BISYS shall have no further obligation to provide Client with improvements, enhancements, modifications or updates to such Application Programs.

D. Client acknowledges that it shall be deemed a sublicensee of BISYS for any systems software programs included in the BISYS Products (the "Systems Programs") which are delivered to Client as part of the Services. Client accepts a sublicense from BISYS of the Systems Programs on a personal, non-exclusive, non-transferable basis with the right to use, during the term of this Agreement, such Systems Programs solely in connection with the Services.

E. Client shall not copy, in whole or in part, any BISYS Products or related documentation, whether in the form of computer media, printed or in any other form, except for copies to used by Client exclusively for its own internal purposes. Client shall not make any alteration, change or modification to any BISYS Products.

F. Client shall treat as confidential and will not disclose or otherwise make available any of the BISYS Products or any trade secrets, processes, proprietary data, information or documentation related thereto including, without limitation, any flow charts, logic diagrams or source code (collectively the "Confidential Information"), in any form, to any person other than employees of Client. Client will instruct its employees who have access to the BISYS Products and the Confidential Information to keep the same confidential by using the same care and discretion that Client uses with respect to its own confidential property and trade secrets. Upon the termination of this Agreement for any reason, Client shall return to BISYS any and all copies of the BISYS Products and the Confidential Information which are in its possession.

## 11. GOVERNMENTAL AGENCIES.

A. Client shall provide all required notices to the appropriate regulatory authorities concerning the initiation or termination of this Agreement, or of any substantial changes in the Services being provided to Client. BISYS agrees that any and all Client Files maintained by it for the Client pursuant to this Agreement shall be available for inspection by the appropriate regulatory authorities and Client's internal auditors and independent public accountants, upon prior written notice to BISYS. All costs incurred by BISYS in the preparation of data for inspection, examination or audit will be charged to Client at BISYS' then standard rates for such services.

B. BISYS shall provide annually to the appropriate regulatory authorities any Third Party Review Reports prepared by independent public accountants with respect to the Services performed by BISYS at the Data Center and copies of BISYS' audited financial statements. By entering into this Agreement, BISYS agrees that it extends to the Office of Thrift Supervision ("OTS") the same authority and responsibility (as applicable to Client) provided to the other regulatory agencies pursuant to the Bank Service Corporation Act, 12 U.S.C. 1867(C) relating to services performed by contract or otherwise.

C. If after the date hereof any modifications to the Services shall be required by law or by any governmental regulatory authority, BISYS shall, except to the extent such changes may be beyond the capability of the BISYS System to implement, conform the Services to be in compliance with such modified laws or governmental regulations. BISYS may, at its discretion, pass on, in whole or in part, on an equitable basis to all users of the Services (including Client) affected by any such modification the actual costs incurred by BISYS in making any such modification to the Services.

## 12. WARRANTY.

A. BISYS represents and warrants that the Services will conform materially to their design specifications and user documentation which may be changed from time to time. This warranty shall not extend to any of the computer programs, data bases and/or BISYS supported files used by BISYS in connection with providing the Services to Client hereunder which have been altered, changed or modified in any way, without BISYS' prior written consent in each instance.

B. EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 13. LIMITATION OF LIABILITY.

A. The remedies specified in this Agreement constitute Client's sole and exclusive remedies in the event of any alleged defaults by BISYS under this Agreement. BISYS' sole liability, if any, for damages (monetary or otherwise) resulting from claims made by Client or any third party arising from or related to any and all causes not covered by the foregoing remedies shall be limited to the lesser of (i) the amount of actual damages incurred by Client or (ii) an amount which shall not exceed the charges paid by Client during the six (6) month period immediately preceding the event from which such liability arose for the Services performed which gave rise to the claim.

B. IN NO EVENT WILL BISYS BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH CLIENT MAY INCUR OR EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF BISYS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 14. PATENT AND COPYRIGHT INDEMNIFICATION.

BISYS will hold Client harmless and, at its own expense, will defend any action brought against Client based on a claim that the Services used within the scope of this Agreement infringe a United States patent or copyright provided Client notifies BISYS promptly in writing of the claim, BISYS has sole control of the defense of this action and all negotiations for its settlement or compromise, and Client cooperates with BISYS in the defense of the action. In the event any of the Services becomes, or in BISYS' opinion is likely to become, the subject of a claim of infringement of patent or copyright, BISYS, at its option, may (i) secure for Client the right to continue using such Service(s), (ii) replace or modify such Services to make it or them non-infringing, (iii) cease providing the affected Service(s) or (iv) if none of the foregoing options is commercially reasonable, in BISYS' opinion, terminate this Agreement. If BISYS exercises its option hereunder to terminate this Agreement, such termination shall be at no penalty to BISYS except that BISYS shall provide the Deconversion assistance described in Paragraph 9(B) at no charge to Client.

## 15. INSURANCE.

BISYS shall maintain, during the term of this Agreement, $10,000,000 of coverage under a Blanket Crime Policy covering fraudulent and dishonest acts committed by its employees for which it is legally responsible. BISYS shall maintain, on its own behalf, insurance coverage for loss from fire, disaster, or other causes contributing to interruption of normal services. Client, at its own expense, will maintain all insurance and fidelity bonds required by the applicable regulatory authorities.

## 16. DEFAULT; REMEDIES UPON DEFAULT.

A. Any of the following events will constitute an "Event of Default" under the Agreement: (i) non-payment of any amounts due hereunder to BISYS by Client; (ii) non-performance of any of Client's or BISYS' other material obligations hereunder; (iii) if any representation or warranty of Client or BISYS is materially breached; (iv) if Client or BISYS files a petition for bankruptcy or becomes the subject of an involuntary bankruptcy petition which is not vacated within 60 days of filing.

3

or becomes insolvent; or (v) if any substantial part of Client's or BISYS' property becomes subject to any levy, seizure, assignment, application or sale for or by any creditor or governmental agency.

B. Upon occurrence of an Event of Default under the Agreement, the non-defaulting party may, at its option, terminate this Agreement provided at least 30 days (or longer period as may be required by the applicable regulatory authorities) prior written notice has been given to the other and such default has not been cured within such period. Upon such termination by BISYS, BISYS may declare all amounts due and to become due hereunder immediately due and payable. The remedies contained in this Paragraph 16 are cumulative and in addition to all other rights and remedies available to the parties under this Agreement or by operation of law or otherwise.

## 17. FORCE MAJEURE

BISYS shall not be liable or deemed to be in default for any delay or failure to perform under this Agreement or for interruption of the Services resulting, directly or indirectly, from any cause beyond BISYS' reasonable control.

## 18. GENERAL.

A. BISYS shall provide Client upon written request, copies of The BISYS Group, Inc.'s (BISYS' parent corporation) current audited financial statements.

B. Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement. This Agreement contains the entire agreement of the parties with respect to its subject matter and supersedes all existing agreements and all other oral, written or other communications between them concerning its subject matter. This Agreement shall not be modified in any way except by a writing signed by both parties.

C. The failure by either party hereto to insist upon strict performance of any of the provisions contained herein shall in no way constitute a waiver of its rights as set forth herein, at law or equity, or a waiver by either party of any other provision or subsequent default by the other party in the performance of or compliance with any of the terms and conditions set forth herein.

D. This Agreement may not be assigned by either party, in whole or in part, without the prior written consent of the other which consent shall not be unreasonably withheld. It shall not be deemed an assignment requiring consent if the stock of either is sold, or all, or substantially all, of the assets are sold so long as such sale does not materially negatively affect the basis of the financial bargain upon which this Agreement is based as of the date hereof and such sale does not materially negatively affect the provision of the Services hereunder. If there is such a negative impact, then the sale shall be deemed an assignment requiring consent as set forth above. This Agreement shall be binding upon and shall inure to the benefit of BISYS and Client and their respective successors and permitted assigns.

E. If any provision of this Agreement (or any portion thereof) shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of this Agreement shall not in any way be affected or impaired thereby.

F. The headings in this Agreement are intended for convenience of reference and shall not affect its interpretation.

G. The individuals executing this Agreement on behalf of BISYS and Client do each hereby represent and warrant that they are duly authorized by all necessary action to execute this Agreement on behalf of their respective principals.

H. Client acknowledges that a breach of any of its obligations under this Agreement relating to the BISYS Products and/or the Confidential Information will cause BISYS irreparable injury and damage and therefore may be enjoined through injunctive proceedings in addition to any other rights or remedies which may be available to BISYS, at law or in equity and BISYS grants Client the same rights with respect to a breach of BISYS' obligations relating to the confidentiality of Client Files.

I. During the term of this Agreement, neither party hereto shall, directly or indirectly, solicit or encourage to leave, any employee of the other without prior written consent, which consent shall not be unreasonably withheld.

BISYS, INC.

Agreed to: _____
          (signature-Authorized Officer)

Name: __W. W. Neville__
         __President__

Title: _____ Date: _4/18/99_
       (print or type)

ALLIANCE FSB

Agreed to: __Lawrence H Chlum__
          (signature-Authorized Representative)

Name: __Lawrence H. Chlun__
         (print or type)

Title: _President_ Date: _3/16/99_
       (print or type)

**THIS AGREEMENT SHALL BECOME EFFECTIVE UPON BEING SIGNED BY AUTHORIZED OFFICERS OF BISYS AND CLIENT. BISYS' MARKETING REPRESENTATIVES DO NOT HAVE THE AUTHORITY TO BIND BISYS.**

ADDENDUM TO SERVICES AGREEMENT NO. CPC - 2779

SERVICES AGREEMENT DATED AS OF _____

Reference is made to the above Services Agreement between the undersigned (the "Agreement") to which this Addendum is attached and made a part thereof.

The Agreement is hereby amended and supplemented as follows:

1.　　Except as expressly amended and supplemented hereby, all terms defined in the Agreement shall have the same meanings when used herein.

2.　　Charges.

2.1　　For purposes of the Agreement and this Addendum, "Exhibit A Services" shall mean the Services identified on attached Exhibit A (both the Standard Services and Special Services listed on Exhibit A). The parties agree that included in the definition of Exhibit A Services are Client usage of any features associated with the Services listed on the Standard Services portion of Exhibit A which features are in existence and available to Client as of the date of this Addendum. Neither features, nor Services, listed on the Price Lists as of the date hereof, but not set forth on Exhibit A shall be deemed to be part of the Exhibit A Services and such other Services and/or features shall be billed to Client in accordance with the provisions of Paragraph 2.3 below. The parties also agree that Exhibit A Services are recurring Services and do not include any installation charges, training charges, one-time license fees or any other one-time charges.

2.2　　During the Initial Period, Client shall be entitled to a fifty percent (50%) discount on the charges, as in effect from time to time, for the Exhibit A Services.

2.3　　In addition to charges for Exhibit A Services, Client will pay BISYS each month for:

(a)　　All usage of Services not set forth on Exhibit A; and

(b)　　All pass-through charges, including but not limited to telecommunication charges, courier charges and reasonable postage charges (which shall not include postage charges for customer service correspondence).

(c)　　The one-time fees for the Services as set forth on Exhibit B hereto, 50% payable upon execution of an Additional Services Agreement relating to any such Services and the remaining 50% payable in the month following installation of any such Services.

(d)　　The usage of any Services as set forth on Exhibit C (optional services), subject to the execution of an Additional Services Agreement relating to such Service.

2.4　　During the first twelve (12) months of the Initial Period, BISYS agrees that the charges for the Services will not be increased. Thereafter, BISYS agrees that any increase in the charges for any Services will be limited in the aggregate to the lesser of (i) five percent (5%) per year, or (ii) the percentage increase in the United States Consumer Price Index as published by the Bureau of Labor Statistics, United State Department of Labor

EXHIBIT

3

("CPI"), during the twelve month period immediately preceding the date of each such increase.

2.5    **Additional Credits.**

(a)    During the Initial Period, BISYS agrees to grant Client a credit in the aggregate amount of $20,000.00. Client may apply this credit at its discretion against the charges for the Services set forth on the Monthly Invoice or against one-time implementation charges reflected on Exhibit B. In either case, the credit cannot be applied against hardware, or actual out-of-pocket expenses.

(b)    In addition, during the first thirty-two months of the Initial Period, BISYS agrees to grant Client a non-cumulative monthly credit in the amount of $312.50. Client may apply this credit at its discretion against the charges for the Services set forth on the Monthly Invoice or against one-time implementation charges for Services purchased by Client after the Conversion Date. In either case, the credits cannot be applied against hardware, or actual out-of-pocket expenses.

3.    <u>FDIC Approval</u>. BISYS acknowledges that this Agreement is subject to the approval of Client's applications to the Federal Deposit Insurance Corporation and the OTS, which are anticipated by Client no later than August 31, 1999. However, in order to induce BISYS to commence work related to converting Client to the BISYS System, Client has executed this Agreement prior to receipt of such approvals. Upon receipt of notice by Client that it has not received either such approval, Client shall immediately provide BISYS written notice that the approval has not been received. Upon receipt of such notice from Client, this Agreement shall be deemed terminated and BISYS shall discontinue any work relating to the conversion of Client to the BISYS System. Client shall pay BISYS for all work performed by BISYS associated with the conversion of Client to the BISYS System through the date of termination of this Agreement.

4.    <u>Year 2000</u>. At no additional charge to Client, BISYS agrees to perform comprehensive tests on the BISYS System to simulate the actual turning of the century. These tests shall be intended to identify any operational issues caused by the occurrence of the date September 9, 1999 and the century change at midnight December 31, 1999. BISYS agrees to release by March 31, 1999 all necessary updates and changes for the BISYS System, if any, to accommodate the turn of the century. BISYS agrees to distribute any such change or updates to the BISYS System when they are generally made available to its clients. Such distribution may be in the form of new releases, updates or other similar methods of distributing software bug fixes as BISYS may see fit. All modifications, updates or changes made by BISYS shall be to the BISYS System, BISYS provided third party software products and interfaces only, and not to any third party provided software. BISYS agrees to assist Client in Year 2000 testing on its data files, if requested; provided that such testing must be completed no later than September 30, 1999. In the event that, in Client's reasonable opinion, the BISYS System is not Year 2000 ready and will not be Year 2000 ready by Conversion Date, Client's sole remedy and BISYS' sole liability shall be for Client to terminate this Agreement, provided that:

(i)    Client shall provide notice of such termination to BISYS no later than April 30, 1999, such notice to include a specific description of the deficiencies in the BISYS System that are the grounds for such termination; and



(ii)    BISYS shall have failed to cure such deficiencies within forty-five (45) days of receipt of such notice; and

(iii)    Client shall pay BISYS for all Services provided to Client, including pass-through charges, through the effective termination date; and

(iv)    Client shall pay BISYS for all Deconversion assistance in accordance with Paragraph 9(B) of the Agreement; and

(v)    All payments must be made prior to the delivery of Client Files.

5.    **Dispute Resolution.**

5.1    Notwithstanding anything to the contrary contained in the Agreement, the substantially prevailing party shall be entitled to recover its litigation/collection costs and reasonable attorneys' fees. In no event shall any failure to remit amounts due to BISYS that are disputed by Client in good faith be deemed a breach of the Agreement that gives rise to BISYS' right to terminate the Agreement.

5.2    Disputes hereunder shall be subject to the jurisdiction of the state and federal courts located in the Northern District of the State of Illinois.

6.    **Governmental Agencies.**

6.1    Paragraph 11(B) of the Agreement is hereby amended by adding the following at the conclusion of the Paragraph: "In the event that any Third Party Review Report contains a "qualified" opinion by the reviewing party, Client shall have the right to terminate this Agreement by providing notice to BISYS of its intention to terminate, provided that BISYS shall have ninety (90) days to cure all material deficiencies noted in such "qualified" opinion. Clauses (iii) through (v) of Paragraph 4 of this Addendum shall apply to any termination under this Paragraph."

6.2    Paragraph 11(C) of the Agreement is hereby amended by adding the following prior to the last sentence of such Paragraph: "In the event that BISYS elects not to perform any such modifications and such failure materially impacts Client's operations, Client shall have the right to terminate this Agreement by providing notice to BISYS of its intention to terminate, provided that BISYS shall have ninety (90) days to cure such failure. Clauses (iii) through (v) of Paragraph 4 of this Addendum shall apply to any termination under this Paragraph."

7.    With respect to any travel and lodging expenses of BISYS employees reimbursable by Client, BISYS agrees that its personnel will only fly coach or business class, and the "per diem" charge will be limited to 120% of the then applicable Federal government per diem for the Chicago area (currently $199 per day per person).

8.    BISYS acknowledges that the Client is "in formation" and that the person executing the Agreement and this Addendum is doing so on behalf of Client. No personal liability shall accrue to such signatory by virtue of his execution of the Agreement and this Addendum on behalf of Client.

9.      Neither BISYS nor Client shall (except to persons acting on behalf of such party) disclose, and neither party shall permit any of its employees or other persons who act or acted in its behalf to disclose, any of the terms and conditions of the Agreement, including without limitation any Addendum or pricing terms, except as may be required by law.

Except as expressly amended and supplemented hereby, the Agreement shall remain unchanged and continue to be in full force and effect.

This Addendum supersedes and replaces any prior agreement (written or oral) as to its subject matter. If there is any conflict between the terms and conditions of this Addendum and the terms and conditions of the Agreement or any prior addendum to this Agreement, the Terms and Conditions of this Addendum shall prevail.

BISYS, INC.                                          ALLIANCE FSB

By: _____              By: _____

Name: __W. W. Neville__                        Name: __Lawrence H. Chlum__
         __President__

Title: _____             Title: __President__

Date: __3|18|99__                              Date: __3|16|99__

_____

**THIS ADDENDUM SHALL BECOME EFFECTIVE UPON BEING SIGNED BY AN AUTHORIZED OFFICER OF BISYS.  BISYS' MARKETING REPRESENTATIVES DO NOT HAVE THE AUTHORITY TO BIND BISYS.**

Contract No. **CHG - 2779**

**ALLIANCE FSB**
**EXHIBIT "A" SERVICES**

**Transaction Account Processing (DDA, MMDA, NOW, Commercial DDA, SUPER NOW)**
- Account Base
- Account Analysis
- Check Register on Statement
- DDA Statement Production (includes interim statements)
- Item Processing Interface
- Line-of-Credit Processing
- Transaction Base
- Variable Interest Rate Processing
- On-Line History

**Savings, Time Deposits/Certificates of Deposits**
- Account Base
- Interest Checks
- On-Line History
- Retirement Accounts
- Statement Production (statement pages printed at BISYS NOT included)
- Variable Interest Rate Processing

**All Deposits**
- Combined Statements
- Production of Activity Reports
- EFT Notices
- Over Draft Reminder Notices
- Currency Reporting
- Account Consolidation Report
- Anniversary Processing
- Audit Confirmations (once per year)
- Bank Check Reconciliation Tape
- CD Renewal Confirmation
- Proxy Reporting
- Realty Trust/Surrogate Processing
- Retirement Account Statements
- Savings Service Charges
- Tenant Rent Security Processing
- Tax Compliance - Withholding
- W9Bs (mailing label and mailer NOT included)
- Account Reconciliation Processing
- Item Processing Interface
- NSF/UCF Qualification Report
- Sweep Accounts
- 1099, 1099R, 5498 Production (forms charge and rendering charge NOT included)
- Interactive Exception Handling
- OTS/FDIC Reports

File Maintenance History
Transaction Processing Notices

**Commercial Loans**
Account Base

**Installment Loans**
Account Base
Adjustable Installment Loans
Commercial Loan Processing
Coupon Loans MICR/OCR
Customer Notices and Billings
Dealer Reporting and Floor Planning
Investor Reporting
Lock Box - Stop Tape Production
On-Line History (18 months)
Student Loan Processing
Annual IL Notice, Statement
Automatic Student Loan Check Printing
Classification Report
Credit Bureau Reporting (up to 2)
FASB #91 Processing
Loan 10K Report
Overdraft/LOC Loan Notice
Savings Account Loan Trial Balance
Simple Interest Loan Analysis

**Mortgage Loans**
Account Base
Tax and Insurance System
Coupon Loans MICR/OCR
Escrow Analysis
Adjustable Loans
Bill and Receipt Processing
Bi-Weekly/Weekly Loans
Collection Loans
Investor Reporting
Lock Box Stop Tape Production
On-Line History (18 months)
Report to Credit Bureaus
AML Reminder Notice Worksheet
Annual Mortgage Borrower Statements
Credit Bureau Reporting - Monthly (up to 2 bureaus)
FASB #91 Processing
FHLMC Form 11 on Magnetic Tape
FHLMC Submission Schedule
Interest on Escrow System
Investor Reporting Tape Production
LASERNET Remittance Tape



Loan Solicitation Tape Production
Loan Solicitations of Printed Forms
Loan 10K Report
ML Available for Sale Report
Tax Bill Processing Tape Production

**Construction Loans**
Account Base
Notices
On-Line History (18 months)

**All Loans**
1098, 1099A, 1099s for OTC Records (forms and rendering NOT included)
1098 Production (forms and rendering NOT included)
Letter Writing
Letter Writing Down Load
File Maintenance History
Multi-Borrower Report

**General Ledger**
Total Financial Manager Windows LAN Version
Accounts Payable (Windows)
Fixed Assets (Windows)
Investment Tracking (DOS)
Per Transaction Fee

**Automatic Transaction Generation and Posting**
From or To ACH
System Generated Transactions
Totalmatic

**Central Information File (CIF)**
Account Base
Memo System
**TargetPlus**
TargetPlus System
16 Reports per Month*

*Any Client usage of TargetPlus in excess of this number will be charged to Client at the charges set forth in the Price Lists.

Contract No. CHG - 2779

ALLIANCE FSB
EXHIBIT B

Service                                                One-Time Installation Charge[1]

Conversion Services (includes : TOSS, ACHIPS)          $  5,962.00   6/30
Total Financial Manager LAN Version Package            $23,750.00   6/30
ATM On-line Service                                    $  5,000.00   6/30
Debit Card Processing                                  $  2,400.00[2]  Not retained

BISYS Encore Branch Automation Software License
   (includes maximum 5 Teller Stations, 3 Platform
   Stations and 3 Inquiry & Maintenance Back-Office Copies)   $32,200.00  6/30              6/30
TIMS/QM Report Retrieval System                        $30,850.00  ( NW 8950.00 + 22000 )
TOSS                                                   $    500.00
ACH Return Item Processing                             $  2,000.00
Total Access Banking Voice Response                    $32,500.00[2]  Not obtained

Data Communication Estimate                            $  6,268.00

(1) These one-time installation charges do not include out-of-pocket travel and lodging expenses or other pass-through charges incurred by BISYS associated with the installation of the Services.

(2) The one-time fees for Debit Card Processing and Voice Response will not change for a period of eighteen (18) months following Conversion Date. After that, the one-time fees will be at then current pricing as set forth on the Special Services Price List.

Contract No. **CHC - 2779**

**ALLIANCE FSB**
**EXHIBIT C**

|  | Estimated Monthly Fees |
|---|---|
| **Special & Optional Services** | |
| ATM On-line Services | $ 689.00 |
| Debit Card Processing | $ 447.00 |
| TIMS/QM Report Management System | $ 365.00 |
| BISYS Encore Branch Automation (includes 5 Teller, 3 Platform/CFI forms, and 3 Back-office devices) | $ 818.00 |
| Terminal Connection Services (11 Terminals) | $ 450.00 |
| Disaster Recovery Assessment | $ 79.00 |
| ACH Return Item Processing | $ 103.00 |
| Total Access Banking Voice Response | $ 1,583.00 |
| Data Communication Estimate | $ 1,066.00 |

**Note:** Charges listed on this Exhibit C are estimates based on current activity and volume. In the event Client elects to purchase any of the Services listed above, actual pricing will be determined pursuant to an Additional Services Agreement to be entered into by BISYS and the Client. Pricing for the Services set forth on this Exhibit C shall be subject to the provisions of Paragraph 2.4 of this Addendum.



4800 S. Pulaski Rd.
Chicago, Illinois 60632
Phone: 773.376.3800   Fax: 773.376.8222   www.pnabank.net

March 4, 2008

Open Solutions, Inc.
455 Winding Brook Drive
Glastonbury, CT 06033
Attn:   Chief Financial Officer

Via Fax & Mail
Fax No. (860) 652-3156

Re:   Notice of Contract Termination
      Service Agreement #2779

Dear Sir or Madam:

   Open Solutions, Inc. currently provides data processing services to PNA Bank pursuant to a Services Agreement dated March 18, 1999, which was subsequently amended December 11, 2001 and April 12, 2007 (hereinafter the "Agreement").

   PNA Bank hereby notifies Open Solutions, Inc. that PNA Bank will not renew the Agreement upon the completion of the term of the Agreement on September 30, 2008.

   Please contact me if you have any questions or comments regarding this matter.

Very truly yours,

Lawrence H. Chlum

Lawrence H. Chlum
President

LHC

Copy to:    Mr. Paul Stuart
            Senior Account Executive
            Open Solutions Inc.
            7052 Nathan Lane
            Carpentersville, IL 60110






Member FDIC

07/16/08    15:16    PNA → 13127821482    NO.820    D02

JUL-16-2008 14:35 FROM:STONE POGRUND KOREY  3127821482    TO:773 286 2325    P.2/2

# STONE
# POGRUND
# & KOREY LLC

*Attorneys at Law*    **Established 1957**

1 EAST WACKER DRIVE, SUITE 2610
CHICAGO, ILLINOIS 60601
PHONE: 312-782-3636 FAX 312-782-1482
www.spklaw.com

WRITER'S E-MAIL ADDRESS:
pjoy@spklaw.com

BERTRAM A. STONE (1915-1994)
SHERWIN L. POGRUND, P.C.
MARTIN S. KOREY
JAMES P. ZIEGLER
DAVID B. POURLAND
CHRISTOPHER T. NOVOLARSKI, P.C.
LAWRENCE J. STARK *
DEAN J. LURIE
STUART M. SHELDON
PATRICK T. JOY
* Also admitted in Florida

July 16, 2008

## VIA CERTIFIED MAIL (RETURN RECEIPT)
## & TELECOPY TO 860-652-3156 (1 page)
Open Solutions, Inc.
455 Winding Brook Drive
Glastonbury, CT 06033
ATTN: Chief Financial Officer

RE:    **Services Agreement #2779 Between Open Solutions Inc., and PNA Bank,
f/k/a Alliance FSB.**

To Whom It May Concern:

This office represents PNA Bank f/k/a Alliance FSB ("PNA Bank") in this matter. Open Solutions, Inc. currently provides data processing services to PNA Bank pursuant to a Services Agreement dated March 18, 1999, which was subsequently amended December 11, 2001 and April 12, 2007 (hereinafter the "Agreement"). Pursuant to paragraph 2(C) of the Services Agreement, PNA Bank notifies Open Solutions, Inc., that the termination date is hereby extended to November 17, 2008. Be advised that this office is authorized to act on behalf of PNA Bank in this regard, as acknowledged and approved below by Lawrence Chlum, president of PNA Bank.

Please contact us if you have any questions or comments regarding this matter.

Very truly yours,
**STONE POGRUND & KOREY LLC**

*[signature]*

Patrick T. Joy

**EXHIBIT
5**

**ACKNOWLEDGED AND APPROVED**
PNA Bank, f/k/a Alliance FSB

*[signature]*

By: Lawrence Chlum, its President

# STONE
# POGRUND
# & KOREY LLC

**Attorneys at Law      Established 1957**

BERTRAM A. STONE (1915-1994)
SHERWIN I. POGRUND, P.C.
MARTIN S. KOREY
JAMES P. ZIEGLER
DAVID B. POGRUND
CHRISTOPHER T. NOWOTARSKI, P.C.
LAWRENCE J. STARK *
DEAN J. LURIE
STUART M. SHELDON
PATRICK T. JOY
* Also admitted in Florida

1 EAST WACKER DRIVE, SUITE 2610
CHICAGO, ILLINOIS 60601
PHONE: 312-782-3636 FAX 312-782-1482
www.spklaw.com

WRITER'S E-MAIL ADDRESS:
cnowotarski@spklaw.com

July 17, 2008

**VIA E-MAIL**
**& CERTIFIED MAIL**
Ms. Cathy Esposito
Open Solutions, Inc.
455 Winding Brook Dr.
Glastonbury, CT 06033

RE:     **PNA BANK V. OPEN SOLUTIONS**
        **Services Agreement #2779**

```
EXHIBIT
   6
```

Dear Ms. Esposito:

This office represents PNA Bank, f/k/a Alliance FSB in the above referenced matter.

Open Solutions, Inc. currently provides data processing services to PNA Bank pursuant to a Services Agreement dated March 18, 1999, which was subsequently amended December 11, 2001 and April 12, 2007 (hereinafter the "Agreements"). On March 4, 2008, our client advised Open Solutions that it would not renew the Agreement upon completion of the term. Subsequently, PNA Bank requested Deconversion services from Open Solutions.

It has come to our attention that Open Solutions is refusing to comply with the terms of the Agreements. Pursuant to the Agreements, the fee for Deconversion services is limited to not more than $26,258.42. Our client has advised us that Open Solutions is demanding that PNA Bank pay to it at least $75,000.00 before it will begin any Deconversion services. This is tantamount to holding our client's data hostage.

We hereby demand that Open Solutions immediately comply with the terms of the Agreements and provide Deconversion services for $26,258.42. Be advised that our client's new data processing vendor must have the first cut of deconverted data by not later than July 30,

2008, and that PNA Bank will hold Open Solutions liable for any losses it incurs as a result of failing to meet this deadline.

We have attempted to contact you multiple times to reach an amicable solution to this matter, however you either failed to return our calls or have been otherwise non-responsive to our client's concerns. Accordingly, be advised that our client has directed us to file the attached lawsuit in the Circuit Court of Cook County Illinois by not later than 4:30 P.M. today. We regret that this action is necessary, but it has become apparent that Open Solutions is either unable or unwilling to resolve this matter in any other way. If you have any questions, please contact the undersigned.

Very truly yours,

**STONE POGRUND & KOREY LLC**

Christopher T. Nowotarski

CTN/pj
Enclosure(s)

cc:    Open Solutions Chief Financial Officer, by facsimile (w/o enclosures) to 860-652-3156
       Mr. Paul Stuart, Open Solutions Inc., by e-mail to paul.stuart@opensolutions.com
       PNA Bank

# CONVERSION / DECONVERSION SERVICES :

**Conversion of Standard Applications**

Three months' charges for new/acquired services provided under Standard Services Price List (plus Travel and Lodging expenses).  (MINIMUM $5,000.)

Conversion charges will be invoiced one-third (1/3) at contract signing/notification, one-third (1/3) at completion of test conversion, and one-third (1/3) at completion of live conversion.

Additional consultation support for file requirements will be billed in accordance with BISYS' published price schedule then in effect.

**Deconversion of Standard Applications**

One-hundred percent (100%) of Average of last twelve (12) months charges exclusive of Discounts for services provided under Standard Services Price List.  (MINIMUM of Twenty Thousand Dollars ($20,000.00)).

Deconversion package includes:

- One (1) set of Test files of Client's files in standard BISYS format.
- Two (2) sets of Live files in standard BISYS format
- One (1) full Trial Balance for each Application at Test and Live.
- One (1) set of Technical record layouts per Application
- Ten (10) hours of telephone consultation support on BISYS system/file formats

Payment shall be made via wire transfer to BISYS.  All past due amounts and related termination charges per the terms of the Services Agreement must be brought current prior to production of final set of files.

Additional consultation support for file requirements will be billed in accordance with BISYS' published price schedule then in effect.

Additional file adjustments, option changes, and special requests will be billed in accordance with BISYS' published price schedule then in effect.

EXHIBIT
7

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CHANCERY DIVISION

| | | |
|---|---|---|
| PNA Bank, f/k/a Alliance FSB, a Federally Chartered Savings Bank, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 08-CH-25809 |
| Open Solutions, Inc., a Delaware corporation, as successor in interest to BISYS, Inc., a Delaware corporation, | ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF RICHARD J. SMIES

Richard J. Smies, being first duly sworn on oath, deposes and states as follows:

1.      That I am the Vice President of Metavante Corporation ("Metavante") and am authorized to make this Affidavit on its behalf.

2.      That if called as a witness, I could competently and with personal knowledge testify as to the facts contained herein.

3.      That Metavante has been retained by PNA Bank to provide data processing software and services.

4.      That PNA Bank is scheduled to convert to Metavante's data processing system on November 17, 2008.

5.      That if Metavante does not receive the "first cut" of data on or before August 1, 2008, it will not be able to convert PNA Bank to Metavante's data processing system on November 17, 2008.

1



EXHIBIT
8

6.   That if PNA Bank is not converted to Metavante's data processing system on November 17, 2008, then the next available date for said conversion is in March of 2009.

**FURTHER AFFIANT SAYETH NOT.**

_____
RICHARD J. SMIES

SUBSCRIBED and SWORN
to before me this 22nd day
of _July_____, 2008

_____
Notary Public

[Notary Seal: NOTARY PUBLIC · ANGELA K. TORRES · STATE OF WISCONSIN]

Christopher T. Nowotarski
Dean J. Lurie
Patrick T. Joy
**STONE POGRUND & KOREY LLC**
1 E. Wacker Dr., Ste. 2610
Chicago, IL 60601
T: 312-782-3636
F: 312-782-1482
Atty. No. 90803

2



July 22, 2008



Mr Larry Chlum
President
PNA Bank
4800 S. Pulaski Rd.
Chicago, IL 60632

**RE: Deconversion Charges Related to Services Agreement Number CHG-2779**

Dear Larry:

Pursuant to your letter dated        , we have begun the process of deconverting PNA Bank from the Open Solutions System as requested by the bank. In preparation for your deconversion from the Open Solutions System scheduled for November 17, 2008, we have estimated the final deconversion charges and monthly recurring charges through your deconversion date, using your June monthly invoice. Please note that the final amounts are subject to change based upon your processing volumes, any additional one-time, deconversion-related charges incurred and Monthly Invoices through the date of deconversion.

Open Solutions reserves the right to bill additional fees as they occur; such as, but not limited to, additional file fixes, year-end processing, postage, deconversion-specific projects, additional arrears fees, and other pass-through items. **Please note, this is not a final bill.** The following schedules are attached.

➤ Schedule A: The total estimated charges due prior to deconversion are $170,854.38.

➤ Schedule B: The Deconversion Fee is estimated to be $75,000. The deconversion package includes:

- One (1) set of Test files of Client files in standard Open Solutions format;
- Two (2) sets of Live files in standard Open Solutions format;
- One (1) full Trial Balance for each application at Test and Live run;
- One (1) set of technical record layouts per application;
- Ten (10) hours of telephone consultation support on Open Solutions system/file formats.

➤ Schedule C: Early Termination Charges are calculated in accordance with paragraph 3B to Services Agreement No. CHG-2779, dated  , and are estimated at $0.

Page 2

➢ Schedule D: Telecommunications related charges are listed. Please note that all leased telecommunications equipment must be returned to Open Solutions no later than 60 days after the Network Disconnect date. Note that Schedule D includes an amount representing a refundable deposit for leased telecommunications equipment, all or a portion of which may be used to offset any outstanding charges related to such equipment.

➢ Schedule F: Past due invoices and other outstanding charges are itemized.

➢ Schedule H: Special Deconversion Services charges are itemized.

Client acknowledges and agrees that Open Solutions shall have no obligation to release test files or live files until all fees due hereunder are paid in full. Payment in full in the amount of $170,854.38 must be made by wire transfer in accordance with the following wire instructions no later than 12:00 Noon, November 12th, in order for Open Solutions to release the test files and/or live files. All fees paid hereunder are non-refundable, except for the deposits on leased telecommunications equipment.

**Bank of America**
**Hartford, CT**
**For wire transfers via ACH:**
Account #003851490358
ABA #011900571
**For direct wire transfers (non-ACH):**
Account #003851490358
ABA #026009593
**Description:** PNA Bank Deconversion

In addition to returning all leased equipment, you should also be prepared to send all software such as Teller, TIMS, and TFM to my attention within the week following deconversion to avoid further license fees and other additional charges. All Telecommunications equipment should be returned per the instructions listed on Schedule D.

Page 3

Please sign below indicating your acknowledgement and acceptance of these terms.  Please feel free to contact me if you have any questions regarding this arrangement.  If you have any specific questions regarding the deconversion, please contact Jane Sidebotham at 800-767-5822, ext 4900.

Sincerely,


Paul Stuart

Enclosures

cc:

ACCEPTED AND AGREED TO THIS ___ DAY OF _____, _____.


_____
By:
Its:

# STANDARD SERVICES DECONVERSION

One-hundred percent (100%) of Average of last twelve (12) months charges, plus the average discount (if any) during the last twelve (12) months, plus any deconversion charges specific to particular services (minimum deconversion fee $75,000.00)

Deconversion package includes:

- One (1) set of Test files of Client's files in standard BISYS format
- Two (2) sets of Live files in standard BISYS format
- One (1) Trial Balance for each Application at Test and Live
- One (1) set of Technical record layouts per Application
- Ten (10) hours of telephone consultation support

Payment shall be made via wire transfer to BISYS. All past due amounts and related termination charges per the terms of the Services Agreement must be brought current prior to production of final set of files.

Additional consultation support for file requirements will be billed in accordance with BISYS' published price schedule then in effect.

Additional file adjustments, option changes, and special requests will be billed in accordance with BISYS' deconversion price schedule then in effect.

(AFFIDAVIT) – EXHIBIT A